In the Matter of C. D. M.

K. C. M. & B. L. M., Appellants,

v.

STATE of Alaska, Appellee.

No. 4764.

Supreme Court of Alaska.

April 24, 1981.

Ronald E. Noel, Birch, Horton, Bittner, Monroe, Pestinger & Anderson, Fairbanks, for K. C. M. and B. L. M.

Andrew J. Kleinfeld, Fairbanks, for C. D. M.

Robert Coats, Asst. Atty. Gen., Fairbanks, Avrum M. Gross, Atty. Gen., Juneau, for the State of Alaska.

OPINION

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and CRASKE, Superior Court Judge.

BURKE, Justice.

This appeal raises the question of whether the superior court has the authority to order the sterilization of a mental incompetent upon petition by the incompetent's legal guardian. We conclude that the superior court, as a court of general jurisdiction, does have the authority to entertain and act upon such a petition.

C.D.M. is a nineteen year old woman who has been afflicted since birth with Down's Syndrome.[1] As a result of her illness, C.D.M.'s I.Q. is in the fifties, placing her in the moderately to mildly retarded range.[2] C.D.M. is generally regarded as educable and is currently receiving vocational training as a kitchen helper. She is also employed two hours a day at a fast food restaurant. Her disabilities are such, however, that it appears clear that she will always require some sort of parental or custodial supervision. On March 19, 1978, shortly after C.D.M. reached the age of majority, she was adjudicated an "incapacitated person" under AS 13.26.005(1) and her parents were appointed as her legal guardians.

C.D.M.'s parents are sensitive to her special needs and concerned about her future. They have actively encouraged her integration into society. Ultimately, they hope to place C.D.M. in a controlled housing situation where, under the supervision of a resident counselor, she will be afforded the maximum opportunity for personal independence and social interactions that her natural limitations will permit.

As C.D.M. matured physically her parents became increasingly concerned about the possibility of her becoming pregnant. Although she is not currently socializing in such a manner as would make this likely, Down's Syndrome individuals are characteristically highly susceptible to being sexually victimized by virtue of their very innocent, trusting and loving nature. Thus, as C.D.M. integrates into society it is quite possible that she will become pregnant.

If C.D.M. were to have a child, there is at minimum a fifty percent chance that the child would also be born with Down's Syndrome. If the father also suffered from the disease it is virtually certain that the child would be so afflicted. Regardless of the condition of the child, it is apparent that C.D.M. would not be able to raise the child without a great deal of assistance.

In light of C.D.M.'s inability to make responsible decisions and to prevent a possible unwanted pregnancy, her doctor, at her mother's request, prescribed birth control pills approximately two years ago. Subse-

1. Down's Syndrome is a type of genetic defect. In its most common form, the cells of the afflicted individual contain 47 chromosomes rather than the normal 46, there being three # 21 chromosomes instead of the usual pair. The disorder can result in a wide variety of psychological and physical anomalies of which mental retardation in varying degrees is by far the most pervasive and limiting. Scientists and physicians have been unable to isolate the cause of the disorder, nor is there any known cure. However, increased understanding of the defect has resulted in an extension of the average life expectancy of a stricken individual from nine years (1929) to eighteen years (1948) to a possible fifty, sixty or seventy years today. *See generally* Pueschel, Down's Syndrome: Growing and Learning (1978); Koch and de la Cruz, Down's Syndrome (Mongolism): Research, Prevention and Management (1975).

2. The use of I.Q. scores to classify the mentally retarded was explained in *In re Grady*, 170 N.J.Super. 98, 405 A.2d 851, 855 (1979), *vacated*, 85 N.J. 235, 426 A.2d 467 (1981), a case involving facts strikingly similar to those presented by the instant case:

> Mental retardation is commonly classified from profound to mild, according to IQ scores. The most profoundly retarded attain IQ scores under 20. They require virtually constant care and have major physical and sensory impairment. Those with scores of 20–35 are severely retarded. They manifest retarded speech, language and motor development. Persons in the moderate range (IQ scores 36–51) are usually slow or retarded in general development and require supervision in a sheltered environment. The mildly (IQ scores 52–67) and borderline (IQ scores 68–83) retarded frequently can work at suitable jobs and achieve a considerable degree of independence. Generally, those with IQ scores 50–75 have been classified as educable and those with 30–50 IQ as trainable.
>
> These categories are general; the number levels are arbitrary. It cannot be said too often: an IQ score is merely a guide.

quently, her parents discussed the question of sterilizing C.D.M. with both her family doctor and a specialist in genetics. Both physicians were of the opinion that sterilization would be in C.D.M.'s best interest. The matter was discussed with C.D.M. by her parents, her guardian ad litem, and both physicians. All agree that C.D.M. seems to understand the consequences of the operation and desires to be sterilized.

On December 4, 1978, having decided that C.D.M. wished to be sterilized and that the operation would be in her best interest, her parents petitioned the superior court for an order authorizing the necessary operation.[3] Following a hearing on the petition, at which C.D.M. was represented by her guardian ad litem and medical testimony was presented, the superior court concluded:

> After inquiring of [C.D.M.], the court is of the opinion that she understands the significance of this operation and it is her desire to have such an operation.

> The court specifically finds that it is in the best interest of [C.D.M.] to have a sterilization, the safest being a tubal ligation.

Nevertheless, the superior court reluctantly denied the petition on the ground that it was without jurisdiction to issue the requested order. This appeal followed.[4]

The superior court's holding that it lacked jurisdiction, despite its status as a court of general jurisdiction,[5] is in conformity with the majority of cases that have addressed this question. These cases stand for the proposition that, absent a specific statutory grant of authority, courts are without jurisdiction to sanction the sterilization of a mental incompetent. *See, e. g., Sparkman v. McFarlin*, 552 F.2d 172 (7th Cir. 1977), *rev'd sub nom. Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); *Wade v. Bethesda Hospital*, 337 F.Supp. 671 (S.D.Ohio 1971); *Hudson v. Hudson*, 373 So.2d 310 (Ala.1979); *Guardianship of Tulley*, 83 Cal.App.3d 698, 146 Cal.Rptr. 266, *cert. denied*, 440 U.S. 967, 99 S.Ct. 1519, 59 L.Ed.2d 783 (1978); *Guardianship of Kemp*, 43 Cal.App.3d 758, 118 Cal.Rptr. 64 (1974); *Matter of S.C.E.*, 378 A.2d 144 (Del.Ch.1977); *Holmes v. Powers*, 439 S.W.2d 579 (Ky.1968); *In re M.K.R.*, 515 S.W.2d 467 (Mo.1974); *Application of A.D.*, 90 Misc.2d 236, 394 N.Y.S.2d 139 (N.Y.Sur. 1977), *aff'd sub nom. Matter of D.D.*, 64

---

**3.** Such an order is, for all practical purposes, required before a doctor will perform the necessary surgery. Incapacitated persons such as C.D.M. are generally incapable of giving effective legal consent to such operations. *Relf v. Weinberger*, 372 F.Supp. 1196, 1202 (D.D.C. 1974), *vacated as moot*, 565 F.2d 722 (D.C.Cir. 1977); *Holmes v. Powers*, 439 S.W.2d 579, 580 (Ky.1968); *Frazier v. Levi*, 440 S.W.2d 393, 394 (Tex.Civ.App.1969). Similarly, due to the significance of the consequences involved, it has been held that neither her parents nor her guardians can effectively consent on her behalf. *Ruby v. Massey*, 452 F.Supp. 361, 366 (D.Conn. 1978) (parents) *Relf v. Weinberger*, 372 F.Supp. at 1202 (guardians); *A.L. v. G.R.H.*, 163 Ind. App. 636, 325 N.E.2d 501, *cert. denied*, 425 U.S. 936, 96 S.Ct. 1669, 48 L.Ed.2d 178 (1975) (parents). Therefore, in order to avoid potential tort liability, doctors generally will not perform the necessary operation absent a court order authorizing the procedure.

Additionally, in the instant case the court order appointing C.D.M.'s parents as her legal guardians specifically required that they obtain a court order authorizing C.D.M.'s sterilization before any such operation was performed.

**4.** Before the superior court, C.D.M.'s guardian ad litem reluctantly argued that jurisdiction did not exist. On appeal, he has reversed his position and now joins C.D.M.'s parents in urging us to find that jurisdiction does exist. The State of Alaska has filed a brief in support of the superior court's holding.

**5.** Article IV, § 3 of the Alaska Constitution provides:

> *Superior Court.* The superior court shall be the trial court of general jurisdiction and shall consist of five judges. The number of judges may be changed by law.

AS 22.10.020(a) provides, in part:

> *Jurisdiction.* (a) The superior court is the trial court of general jurisdiction, with original jurisdiction in all civil and criminal matters, including but not limited to probate and guardianship of minors and incompetents. The jurisdiction of the superior court extends over the whole of the state. The superior court and its judges may issue injunctions, writs of review, mandamus, prohibition, habeas corpus and all other writs necessary or proper to the complete exercise of its jurisdiction.

A.D.2d 898, 408 N.Y.S.2d 104 (1978); *Frazier v. Levi*, 440 S.W.2d 393 (Tex.Civ.App. 1969). While some of these cases could have been decided on the grounds that the court petitioned was a court of limited jurisdiction,[6] all of the decisions rest, at least in part, on the rationale that "the awesome power to deprive a human being of his or her fundamental right to bear or beget offspring must be founded on the explicit authorization of the Legislature rather than a mere inference deduced from the general principles of common law or the canons of equity jurisprudence." *Guardianship of Tulley*, 146 Cal.Rptr. at 270, 83 Cal.App.3d 698.[7]

After a close examination of this line of authority, we have come to the conclusion that its reasoning is faulty. We believe these decisions confuse the question of a court's authority to hear and decide such matters with the question of whether, in exercising that authority, the court can order a particular individual sterilized without violating his or her constitutional rights. As a result, these courts have held that they lacked *jurisdiction* when their concern should have been whether or not an order sanctioning the sterilization of a particular incompetent would have been *constitutional*.[8]

■ The question of a court's jurisdiction goes to its power to hear and adjudicate the subject matter in a given case. *Leege v. Strand*, 384 P.2d 665, 668 (Alaska 1963). Where a court is one of general jurisdiction, such as the superior court in the case at bar, it has traditionally been regarded as having the power to hear all controversies which may be brought before a court within the legal bounds of rights or remedies, except insofar as has been expressly and unequivocally *denied* by the state's constitution or statutes. *Fine v. Commonwealth*, 312 Mass. 252, 44 N.E.2d 659, 661 (1942); *Bryan v. Miller*, 73 N.D. 487, 16 N.W.2d 275, 281 (1944); *Midwest Piping and Supply Co. v. Thomas Spacing Mach. Co.*, 109 Pa.Super. 571, 167 A. 636, 638 (Pa.Super.1933); *In re Hudson*, 13 Wash.2d 673, 126 P.2d 765, 777 (Wash.1942); *Smith v. Smith*, 81 W.Va. 761, 95 S.E. 199, 200 (1918); 21 C.J.S. *Courts* §§ 16, 238 (1940). This has been particularly true with respect to the jurisdiction of courts of equity over incompetents. As noted in *Strunk v. Strunk*, 445 S.W.2d 145 (Ky.App.1969):

It is a universal rule of equity that where a person is not equal to protecting

---

**6.** *See, e. g., Wade v. Bethesda Hosp.*, 356 F.Supp. 380 (S.D.Ohio 1973); *Guardianship of Kemp*, 43 Cal.App.3d 758, 118 Cal.Rptr. 64 (1974); *In re M.K.R.*, 515 S.W.2d 467 (Mo. 1974); *Matter of D.D.*, 408 N.Y.S.2d 104, 64 A.D.2d 898 (N.Y.App.Div.1978); *Frazier v. Levi*, 440 S.W.2d 393 (Tex.Civ.App.1969).

**7.** *See also Sparkman v. McFarlin*, 552 F.2d 172 (7th Cir. 1977), *rev'd sub nom. Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); *Hudson v. Hudson*, 373 So.2d 310 (Ala.1979); *Matter of S.C.E.*, 378 A.2d 144 (Del. Ch.1977); *In re M.K.R.*, 515 S.W.2d 467 (Mo. 1974); *Application of A.D.*, 90 Misc.2d 236, 394 N.Y.S.2d 139 (N.Y.Sur.1977) *aff'd sub nom. Matter of D.D.*, 64 A.D.2d 898, 408 N.Y.S.2d 104 (N.Y.App.Div.1978).

**8.** This misconception appears to have its origins in the Michigan case of *Smith v. Command*, 231 Mich. 409, 204 N.W. 140 (1925). In *Smith*, the trial court had ordered the sterilization of a sixteen year old "feeble-minded" boy pursuant to a statute which authorized such orders. After upholding the constitutionality of the statute, the Michigan Supreme Court noted the trial court's failure to comply with the statute's detailed procedural requirements and reversed the trial court's order, stating: "The [procedural] requirements of the statute above referred to are jurisdictional, and no valid order can be made without a substantial compliance with them." *Id.* at 146. A careful reading of the case discloses that the use of the term "jurisdictional" was merely an unfortunate choice of words. The court was attempting to emphasize the paramount importance of compliance with the statutory safeguards; any order issued without compliance with these safeguards would be unconstitutional. Nowhere in the opinion is there any language which would support the conclusion that the violation of these procedural requirements would strip the court of jurisdiction. Despite this apparent inconsistency, subsequent cases have consistently been disposed of on the grounds that jurisdiction did not exist, initially without further explanation and more recently under the faulty rationale which confuses a court's jurisdiction to hear and decide the matter with the limitations imposed by the constitution on the remedies available to the court.

himself in a particular case, the court will protect him. As part of the inherent power of equity, a court of equity has full and complete jurisdiction over the persons of those who labor under any legal disability and also over their property.... Where legal disability of the individual is shown, *the jurisdiction of the court is plenary and potent to afford whatever relief may be necessary* to protect his interests and preserve his estates. The court's action in such a case is not limited by any narrow bounds, but it is empowered to stretch forth its arms in whatever direction its aid and protection may be needed. While this is indeed a special exercise of equity jurisdiction, it is beyond question that by virtue thereof the court may pass upon purely personal rights.

*Id.* at 147, *quoting* 27 Am.Jur.2d *Equity* § 69, at 592 (1969) (emphasis added). In *Strunk*, the Kentucky Court of Appeals held that the decision whether or not to authorize a kidney transplant from an incompetent to his gravely ill brother was well within the trial court's inherent *parens patriae* jurisdiction as a court of equity.[9]

Subsequent cases have clearly established that the doctrine of *parens patriae* jurisdiction also extends to those difficult cases where the court must decide on behalf of an incompetent whether or not to consent to shock treatment,[10] chemotherapy treat-

ment,[11] amputation,[12] medication,[13] and the removal of artificial life support mechanisms.[14] We see no reason why the superior court's inherent *parens patriae* jurisdiction should not apply as well to a petition for sterilization of an incompetent.[15] Indeed, to ignore this well-settled doctrine in favor of the so-called majority rule would amount to nothing less than an abdication of our judicial responsibilities, leaving C.D.M. and her parents without any means of recourse. Although we recognize that this petition, and others like it, present many troublesome questions, we are also "mindful that a court 'cannot escape the demands of judging or of making .... difficult appraisals.'" *Guardianship of Hayes*, 93 Wash. 228, 608 P.2d 635, 637 (1980), *quoting Haynes v. Washington*, 373 U.S. 503, 515, 83 S.Ct. 1336, 1344, 10 L.Ed.2d 513, 521 (1963).

Further support for our conclusion that the superior court has jurisdiction over a petition for sterilization can be found in the United States Supreme Court's recent decision in *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978). In *Stump*, the Supreme Court held that a trial judge was immune from a suit stemming from his order sanctioning the sterilization of a somewhat retarded fifteen year old girl. In reversing the Seventh Circuit, the Court declared:

**9.** *See also Hart v. Brown*, 29 Conn.Sup. 368, 289 A.2d 386 (1972); *Little v. Little*, 576 S.W.2d 493 (Tex.Civ.App.1979). In yet another organ transplant case, *In re Guardianship of Pescinski*, 67 Wis.2d 4, 226 N.W.2d 180 (Wis.1975), the Wisconsin Supreme Court held that it was without power to approve the petition, expressly declining to invoke the doctrine of substitute judgment. A close reading of the case, however, reveals that the decision was based on the belief that the proposed operation would not have been in the incompetent's best interest and not on the belief that the court was without authority. *See also In re Richardson*, 284 So.2d 185 (La.App.1973).

**10.** *Price v. Sheppard*, 307 Minn. 250, 239 N.W.2d 905, 911 (1976).

**11.** *Superintendent of Belchertown State School v. Sackewitz*, 370 N.E.2d 417 (Mass.1977).

**12.** *Matter of Schiller*, 148 N.J.Super. 168, 372 A.2d 360 (1977); *Application of Long Island Jewish-Hillside Medical Center*, 73 Misc.2d 395, 342 N.Y.S.2d 356 (N.Y.Sup.1973).

**13.** *In re Boyd*, 403 A.2d 744 (D.C.App.1979).

**14.** *In re Quinlan*, 70 N.J. 10, 355 A.2d 647, 666, *cert. denied sub nom. Garger v. New Jersey*, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976).

**15.** At least four other courts have reached this conclusion when faced with a petition for sterilization. *In re Grady*, 85 N.J. 235, 426 A.2d 467 (1981); *In re Sallmaier*, 378 N.Y.S.2d 989 (N.Y. Sup.1976); *In re Simpson*, 180 N.E.2d 206 (Prob. Ohio 1962); *Guardianship of Hayes*, 93 Wash. 228, 608 P.2d 635 (1980). It should be noted, however, that the court, in *Application of A. D.*, 90 Misc.2d 236, 394 N.Y.S.2d at 140, declined to follow the decision in *Sallmaier*.

It is true that the statutory grant of general jurisdiction to the Indiana circuit courts does not itemize types of cases those courts may hear and hence does not expressly mention sterilization petitions presented by the parents of a minor. But in our view, it is more significant that there was no Indiana statute and no case law in 1971 prohibiting a circuit court, a court of general jurisdiction, from considering a petition of the type presented to Judge Stump. The statutory authority for the sterilization of institutionalized persons in the custody of the State does not warrant the inference that a court of general jurisdiction has no power to act on a petition for sterilization of a minor in the custody of her parents, particularly where the parents have authority under the Indiana statutes to 'consent to and contract for medical or hospital care or treatment of [the minor] including surgery.' ... The District Court concluded that Judge Stump had jurisdiction ... to entertain and act upon Mrs. McFarlin's petition. We agree with the District Court, it appearing that *neither by statute or case law has the broad jurisdiction granted to the circuit courts of Indiana been circumscribed to foreclose consideration of a petition for authorization of a minor's sterilization.*

*Id.* at 358, 98 S.Ct. at 1105, 55 L.Ed.2d at 340 (citations omitted). As in *Stump,* there is no state statute or case law prohibiting the superior court, a court of general jurisdiction, from considering the petition presented in this case. Additionally, under AS 13.26.150(a)(3), guardians are specifically empowered to "give any consents or approvals that may be necessary to enable the ward to receive medical or other professional care ...." Although we recognize that *Stump* is not conclusive since it dealt primarily with the issue of judicial immunity, we nevertheless regard it as instructive on the question of jurisdiction.

■ We hold that the superior court, as a court of general jurisdiction, does have, as part of its inherent *parens patriae* authority, the power to entertain and act upon a petition seeking an order authorizing the sterilization of a mental incompetent. The superior court's holding to the contrary must therefore be reversed and the case remanded for further proceedings in accordance with this opinion.

Having concluded that the superior court does, in fact, have jurisdiction over the subject matter of the petition we turn next to the minimum standards that should govern the court's exercise of that jurisdiction.

At least three other courts have established such standards. *Wyatt v. Aderholt,* 368 F.Supp. 1383, 1384–86 (N.D.Ala.1974); *In re Grady,* 85 N.J. 235, 264, 426 A.2d 467, 482–483 (1981); *Guardianship of Hayes,* 608 P.2d at 641. *See also, North Carolina Association for Retarded Children v. North Carolina,* 420 F.Supp. 451, 456–57 (M.D.N.C. 1976). After carefully reviewing these decisions, we have determined that the following guidelines should be applied by the courts of Alaska.

■ Sterilization necessarily results in the permanent termination of the intensely personal right to procreate. Therefore, before sanctioning the sterilization of an incompetent, the court must take great care to ensure that the incompetent's rights are jealously guarded. The advocates of the proposed operation bear the heavy burden of proving by clear and convincing evidence that sterilization is in the best interests of the incompetent.[16]

■ Basic notions of procedural due process require that the incompetent be afforded a full judicial hearing at which medical testimony is presented and the incompetent, through a guardian ad litem, is allowed to present proof and cross-examine witnesses. *See, e. g., In re Grady,* 85 N.J. 235, 266, 426

**16.** The United States Supreme Court has recently held that the due process clause of the Fourteenth Amendment to the United States Constitution requires that the "clear and convincing" standard of proof be applied to civil commitment proceedings. *Addington v. Texas,* 441 U.S. 418, 433, 99 S.Ct. 1804, 1813, 60 L.Ed.2d 323, 335 (1979). We are convinced that this standard is equally applicable to a petition for sterilization.

A.2d 467, 482–483 (1981); *Guardianship of Hayes*, 608 P.2d 635, 641 (Wash.1980). The court must assure itself that a comprehensive medical, psychological, and social evaluation is made of the incompetent. If it is necessary in meeting this standard that independent advice be obtained then the court should, on its own motion, obtain such advice. *Id.*

█ Within this framework, the court must first determine that the individual, legally is incompetent to make her own decision whether or not to be sterilized and that this incapacity is in all likelihood permanent. Under AS 13.26.005(1), such a finding requires that the court be satisfied that the individual in question "lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his person."

It must then be established that the incompetent is capable of reproduction and that, as a result of her disability, she would be unable to adequately care and provide for her offspring. The court's inquiry should go both to the individual's present ability to adequately care for a child and the possibility that such skills would be acquired in the future. Medical testimony concerning the incompetent's physical and psychological ability to deal with pregnancy should also be presented, as well as testimony on the possible detrimental emotional effects of sterilization.

Next, it must be shown that sterilization is the only practicable means of contraception. This necessarily requires detailed medical evidence concerning the various alternative methods of contraception that are available along with an explanation why one of these less drastic methods could not be utilized in the case in question. Additionally, it must be established that the proposed operation involves no greater intrusion into the incompetent's person than is absolutely necessary. In short, the proponents of sterilization must show that there is no less restrictive alternative to the proposed operation.

To the extent possible, the court must also elicit testimony from the incompetent concerning her understanding and desire for the proposed operation and its consequences. Although the individual's status as an "incapacitated person" prevents her expressed desires from being conclusive, this does not mean that her apparent preferences can be totally ignored.[17]

Finally, the court must examine closely the motivation behind the petition. The court should give careful consideration to whether the petition is motivated by genuine concern for the best interests of the incompetent rather than concern for the petitioner's own or the public's convenience.

The above-stated guidelines are not intended to be an all-inclusive list of the various factors which the superior court should consider before ruling on a petition for sterilization. Rather, they set forth what we believe to be the minimum inquiries necessary to protect the constitutional rights of the incompetent. The need for additional inquiries and the weight to be given to each factor will vary with the particular facts and circumstances of each case.

Applying these factors to the case at bar, we are convinced that another hearing will be necessary on remand. Additional fact finding on the questions of alternative methods of contraception and C.D.M.'s preferences would be particularly helpful. Dr. Wells, C.D.M.'s family physician, adequately explained why "barrier methods, [such as] foam and diaphram, [sic]" or an "intrauterine device," would not be acceptable alternatives in her case. The record, however,

---

17. We believe that the incompetent's apparent preferences should be treated much the same as those of a child in a custody hearing. AS 09.55.205(3) specifically permits the court to consider the child's preferences as one factor in the custody determination. Of course, the weight to be accorded to the child's preferences will vary with her ability to comprehend the purpose and significance of the proceedings. *See generally, Lacy v. Lacy*, 553 P.2d 928 (Alaska 1976); Annot., Child's Wishes as Factor in Awarding Custody, 4 A.L.R.3d 1396 (1965). Similarly, the weight to be accorded to an incompetent's preferences will depend upon the degree to which she appears to understand the purpose and significance of sterilization.

does not disclose, with the same degree of particularity, the reasons for his opinion that birth control pills could or should not be utilized in lieu of outright sterilization. As a result, questions remain why this less drastic method of contraception is not feasible. Further exploration of C.D.M.'s preferences is also warranted. The superior court concluded that C.D.M. understands and desires the proposed operation. While the superior court did engage in a cursory examination of C.D.M. at the end of the hearing, the record suggests that the court's conclusion was based primarily on the representations of her parents, doctors and guardian ad litem. Such representations are clearly not an adequate substitute for an independent, in-depth examination by the superior court. *See Lacy v. Lacy*, 553 P.2d 928, 932 (Alaska 1976). On remand, the superior court should question C.D.M. at length concerning the nature and consequences of the proposed operation, avoiding, to the greatest extent possible, the use of leading questions.

REVERSED AND REMANDED.

MATTHEWS, Justice, with whom RABINOWITZ, Chief Justice, joins, dissenting.

The majority holds that the superior court, as a court of general jurisdiction has inherent *parens patriae* authority to order the sterilization of a mental incompetent. I disagree. In my opinion, courts are without jurisdiction to act upon sterilization requests unless such jurisdiction is specifically conferred by statute.

Sterilization is an extreme remedy which irreversibly denies a human being the fundamental right to bear and beget children.[1]

Because of the importance of the interest involved and the irreversible physical consequences of the requested relief, a majority of courts in the United States has refused to order surgical sterilization in the absence of specific statutory authority. As noted in *Sparkman v. McFarlin*, 552 F.2d 172, 176 (7th Cir. 1977), *rev'd sub nom. Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), the power of the courts to fashion new common law does not include the power "to create new decisional law to order extreme and irreversible remedies such as sterilization...." I agree with the majority of courts and commentators[2] that courts lack inherent power to sanction sterilizations.

The majority in holding that states have inherent *parens patriae* power to order sterilization, cites several cases in which courts have consented to shock treatment, chemotherapy treatment, amputation, medication and the removal of artificial life support systems on behalf of incompetents. This case does not involve a request for ordinary medical treatment or surgery necessary to preserve life, but rather, involves a request for elective surgery which would irreversibly deprive a human being of a fundamental right. Although sterilization may be appropriate in some situations, the profound nature of the interest involved leads me to the conclusion that jurisdiction to sanction sterilizations may only be conferred by the legislature after a full consideration of the important social and constitutional issues involved.[3]

The majority opinion is based on the facts of a single case in which there were no

---

1. The fundamental nature of the right to procreate was noted by Justice Douglas in *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655, 1660 (1942), "We are dealing here with legislation which involves one of the basic civil rights of man. Marriage and procreation are fundamental to the very existence and survival of the race ... There is no redemption for the individual whom the law touches ... he is forever deprived of a basic liberty."

2. *See*, R. Burgdorf and M. Burgdorf, *The Wicked Witch is Almost Dead: Buck v. Bell And the Sterilization of Handicapped Persons*, 50 Temp. L.Q. 995 (1977); Comment, *Sterilization, Retardation, and Parental Authority*, 1978 B.Y.U. L.R. 380; Note, *The Constitution and the Family*, 93 Harv.L.R. 1156, 1296, 1303 (1980).

3. As noted by the dissent in *In re Hayes*, 608 P.2d 635, 644 (Wash.1980) (dissenting opinion) "[sterilization] legislation lies within the sphere of the police power, it is not within the inherent power of the courts...."

truly adverse parties.[4] Consequently, issues essential to an informed resolution of the problem were not presented to the court. Because sterilization touches upon constitutional rights of privacy and procreation, it is important that all possible arguments and viewpoints be considered before any policy in favor of state-ordered sterilization is adopted.

In resolving this issue the court did not hear, for example, testimony concerning the ability of retarded persons to parent. The majority seems to assume that because C.D.M. is apparently incapable of caring for a child, mental retardation is coextensive with unfitness as a parent. However, studies have shown that persons with mild or moderate forms of retardation can provide suitable environments for child rearing.[5] Nearly 90% of the mentally retarded persons in the United States are only mildly retarded. In light of the fact that such a large proportion of retarded persons are capable of functioning as parents, the majority's determination that courts have inherent power to terminate a person's right to procreate is particularly troubling.

In addition, no testimony was heard concerning the possibility that safe, long-term methods of birth control or reversible sterilization may be available in the future.[6] If the current state of scientific and medical knowledge is such that a less intrusive method of birth control may be available shortly, articulation of a policy in favor of sterilization would be unnecessary or could be postponed. In any event, postponement would seem to be appropriate where, as in the case of C.D.M., the present method of birth control is not creating a health risk.

Finally, the majority did not consider the particularly troubling aspects of the sterilization of a teenager or young adult. C.D.M. is only 20 years old and lives with her parents. The validity of predicting her desire to be permanently sterilized on the basis of her present acquiescence in the wishes of her parents is questionable. As C.D.M. moves out of her parents' home, perhaps and into a controlled housing situation, her attitudes towards marriage and children may change. She may marry a spouse who would be able to care for a child of the marriage. Moreover, as she becomes more independent, C.D.M. may develop the legal capacity to decide for herself whether to be sterilized.

If sterilization legislation were pending before the legislature, persons and groups unrepresented in this litigation would undoubtedly come forward and provide testimony invaluable to a resolution of the problem. In addition, the legislature has the necessary resources to fully research issues of public policy. The legislature, is, therefore, better equipped than this court to determine whether and under what conditions the state may order sterilizations.

The majority cannot rely on *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978). In *Stump*, the issue was whether a state judge who ordered the sterilization of a minor girl was entitled to judicial immunity from damages in a suit brought by the sterilized woman and her husband. The court noted that under the well-established doctrine of judicial immunity "judges ... are not liable to civil actions for their judicial acts, even where such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly." 435 U.S. at 355–56, 99 S.Ct. at 1104–05, 55 L.Ed.2d at 338–39, *quoting, Bradley v. Fisher*, 13 Wall 335, 347, 20 L.Ed. 646, 650 (1872). The Court did not hold that courts of general jurisdiction have the

---

4. On appeal C.D.M.'s parents and her guardian ad litem argued in favor of sterilization. The state was appointed to brief the other side, but had no real interest in the outcome of the appeal.

5. *See* C. Murdock, *Sterilization of the Retarded: A Problem or Solution*, 62 Cal.L.R. 917 (1974).

6. The only medical testimony presented was that of C.D.M.'s doctor, Dr. Wells, who recommended that C.D.M. be sterilized. Dr. Wells testified briefly about alternative forms of birth control, but did not discuss the possibility that less intrusive methods of birth control may be available in the future.

authority to order sterilizations,[7] rather, it concluded that the scope of a judge's jurisdiction must be construed broadly where the issue is judicial immunity.

*Stump* illustrates the dangers inherent in allowing courts of general jurisdiction to order sterilizations in the absence of specific statutory guidelines. In *Stump* the mother of a minor girl alleged her daughter, Linda, was "somewhat retarded," although she attended public school and had been promoted each year with her class. The mother further alleged that Linda had been staying overnight with young men and therefore a tubal ligation was necessary "to prevent unfortunate circumstances." On the basis of these allegations, the court ordered Linda sterilized. Linda did not discover she had been sterilized until she was unable to become pregnant after two years of marriage. As noted by the dissent in *In re Hayes*, 608 P.2d 635, 646 (1980) (dissenting opinion) *Stump* "stands as an ominous warning of how easily the asserted power to order sterilization can be mistakenly exercised."

Any restrictions on the fundamental right to bear and beget children must be delineated by the legislature. After the legislature has established the standards and conditions, if any, under which sterilizations may be performed, the courts can determine whether the statutory restrictions on procreation are constitutional.

7. By denying certiorari in *Guardianship of Tulley*, 83 Cal.App.3d 698, 146 Cal.Rptr. 266 (Cal. App.1978), *cert. denied*, 440 U.S. 967, 99 S.Ct. 1519, 59 L.Ed.2d 783 (1979), the Supreme Court recently declined an opportunity to specifically hold that courts of general jurisdiction have authority to order sterilizations absent specific statutory authority.