**In the Matter of LaVista Earline ROMERO, Incapacitated Person/Appellant,**

**and concerning Shirley J. Harvey, Guardian/Appellee.**

**No. 89SA248.**

Supreme Court of Colorado, En Banc.

April 23, 1990.

**820**

David Johnston, Paonia, for Incapacitated Person, appellant.

Bradley Kolman, Delta, for Guardian, appellee.

Marjorie J. Long, Denver, for amicus curiae Legal Center Serving Persons with Disabilities.

Kelly, Haglund, Garnsey & Kahn, Edwin S. Kahn, Denver, for amicus curiae ACLU Foundation of Colo., Inc.

Justice LOHR delivered the Opinion of the Court.

This case involves a guardian's petition seeking a court order authorizing steriliza-

tion of her ward, an incapacitated adult woman. After an evidentiary hearing, the Delta County District Court issued the sterilization order. We reverse the district court's order.

I.

LaVista Romero is a thirty-seven year old woman, who is the mother of two children. When Ms. Romero was thirty-three years old, she suffered oxygen deprivation from complications associated with diabetes, and brain damage resulted. On October 8, 1985, Shirley J. Harvey, Ms. Romero's mother, petitioned the Delta County District Court to have Ms. Romero declared an incapacitated person[1] and to have herself appointed guardian. The court entered the requested order. *See* §§ 15–14–301 to 15–14–314, 6B C.R.S. (1987) (provisions for appointment of guardians for incapacitated persons).

On June 14, 1988, Ms. Harvey petitioned the Delta County District Court to order sterilization of Ms. Romero. A guardian ad litem was appointed for Ms. Romero, and on August 31, 1988, the court held an evidentiary hearing. After hearing the testimony of Ms. Harvey, Ms. Romero, three doctors, and a social worker on the staff of the nursing home where Ms. Romero resided, the court ordered that Ms. Romero be sterilized.[2]

This appeal was then filed on Ms. Romero's behalf.[3]

II.

No Colorado statute authorizes district courts to act on petitions for sterilization in circumstances applicable to Ms. Romero.[4]

**1.** § 15–14–101(1) defines an "incapacitated person" as

any person who is impaired by reason of mental illness, mental deficiency, physical illness or disability, advanced age, chronic use of drugs, chronic intoxication, or other cause (except minority) to the extent that he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his person.

**2.** The court specified that the sterilization would be accomplished by tubal ligation, as the guardian had requested. Tubal ligation involves tying

the uterine tubes. *The Sloane–Dorland Annotated Medical–Legal Dictionary* 416 (1987).

**3.** On appeal Ms. Romero has challenged the constitutionality of §§ 27–10.5–128, 27–10.5–130, 11B C.R.S. (1989). Although we do not reach the constitutional issue, *see* n. 15, it supplies the basis for our jurisdiction over this appeal. *See* § 13–4–102(1)(b), 6A C.R.S. (1987).

**4.** §§ 27–10.5–128, 27–10.5–130, 11B C.R.S. (1989), govern the sterilization of developmentally disabled individuals.

We have held, however, that district courts have jurisdiction to act on petitions for sterilization of incompetent persons under the courts' *parens patriae* authority. *In re A.W.*, 637 P.2d 366, 373–75 (Colo.1981); [5] *see also In re C.D.M.*, 627 P.2d 607, 611 (Alaska 1981); *In re Moe*, 385 Mass. 555, 432 N.E.2d 712, 718 (1982); *In re Grady*, 85 N.J. 235, 426 A.2d 467, 479–81 (1981); *In re Guardianship of Hayes*, 93 Wash.2d 228, 608 P.2d 635, 637–39 (1980).

### III.

■ Any exercise of state power to order the non-consensual sterilization of an individual must be scrutinized carefully because of the individual's rights and interests that are at stake. An individual's right to procreate is fundamental. *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942). Sterilization involves a surgical invasion of bodily integrity. It destroys "an important part of a person's social and biological identity," *Grady*, 426 A.2d at 472, can be traumatic for the individual, and can have "longlasting detrimental emotional effects." *Hayes*, 608 P.2d at 640.

§ 27–10.5–102(10)(a) defines "developmental disability" as

> a disability that is manifested before the person reaches twenty-two years of age; constitutes a substantial handicap to the affected individual; and is attributable to mental retardation or related conditions which include cerebral palsy, epilepsy, autism or other neurological conditions when such conditions result in impairment of general intellectual functioning or adaptive behavior similar to that of mentally retarded persons.

Because Ms. Romero's incapacity is the result of oxygen deprivation she experienced when she was thirty-three, she is not developmentally disabled within the statute's meaning.

In 1985, Article 10.5 of Title 27 C.R.S. was amended substantially. Ch. 240, §§ 1–49, 1985 Colo. Sess. Laws 983. Before those amendments, §§ 27–10.5–128, 27–10.5–130, 11 C.R.S. (1982), referred to mentally retarded persons rather than developmentally disabled persons. § 27–10.5–102(b)(8) defined a "mentally retarded person" as

> a person whose intellectual functions have been deficient since birth or whose intellectual development has been arrested or impaired by disease or physical injury to such an extent that he lacks sufficient control, judgment, and discretion to manage his property or affairs

Our society has a history of using sterilization procedures to prevent procreation by mentally retarded individuals. During the early 1900s, social reformers advocated eugenic sterilization [6] as a solution to problems such as mental retardation. Thirty states enacted statutes authorizing compulsory eugenic sterilization,[7] Sherlock & Sherlock, *Sterilizing the Retarded: Constitutional, Statutory and Policy Alternatives*, 60 N.C.L.Rev. 943, 945 (1982), and the United States Supreme Court upheld such a statute, *Buck v. Bell*, 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000 (1927). Eugenic sterilization theories have since been largely discredited and many states have repealed their statutes. Note, *Eugenic Sterilization Statutes: A Constitutional Reevaluation*, 14 J.Fam.L. 280, 284 (1975). The United States Supreme Court's recognition of the fundamental right of procreation in *Skinner v. Oklahoma* cast doubt upon the continued validity of state-ordered sterilization for eugenic purposes. *See In re A.W.*, 637 P.2d at 368–69.

■ Along with an individual's fundamental right to procreate, however, the United States Supreme Court has recog-

> or who, by reason of this deficiency and for his own welfare or the welfare or safety of others, requires protection, supervision, guidance, training, control, or care.

5. *In re A.W.* related specifically to a petition for sterilization of a mentally retarded minor. Our reasoning on the jurisdictional issue in that case, and the authorities supporting it, apply as well to other incompetent persons. 637 P.2d at 373–75.

6. As explained in *In re A.W.*,

> Eugenics is defined as the science of improving the qualities of the human race by the careful selection of parents. *Random House Dictionary*, Unabridged edition (1973). "Positive eugenics would accomplish this by encouraging reproduction of those with favorable traits; negative eugenics, such as sterilization, would discourage or prohibit the reproduction of those with unfavorable traits." Note, *Eugenic Sterilization—A Scientific Analysis*, 46 Denver L.J. 631, 631 (1969).

637 P.2d at 369 n. 2.

7. Colorado has never enacted a compulsory sterilization statute. *See In re A.W.*, 637 P.2d at 368 n. 3.

nized an individual's right to prevent procreation. The decision whether to bear or beget a child is a constitutionally protected choice. *Carey v. Population Serv. Int'l*, 431 U.S. 678, 685, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977); *Eisenstadt v. Baird*, 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972); *see Griswold v. Connecticut*, 381 U.S. 479, 485, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965). We have recognized the fundamental right to prevent conception through non-compulsory sterilization. *In re A.W.*, 637 P.2d at 369.

Because of the seriousness of the rights and interests at stake and the irreversibility of sterilization,[8] courts must exercise great care and caution in evaluating petitions for non-consensual sterilization. *See C.D.M.*, 627 P.2d at 612; *In re Truesdell*, 63 N.C.App. 258, 304 S.E.2d 793, 805–06 (1983), *aff'd*, 313 N.C. 421, 329 S.E.2d 630 (1985); *In re Terwilliger*, 304 Pa.Super. 553, 450 A.2d 1376, 1382 (1982); *Hayes*, 608 P.2d at 641.

### IV.

#### A.

▪ The threshold consideration in a trial court's determination whether to order sterilization of an incapacitated person is whether that individual is competent to grant or withhold consent to the sterilization procedure. *In re A.W.*, 637 P.2d at 375; *see also Moe*, 432 N.E.2d at 721; *Grady*, 426 A.2d at 482; *Hayes*, 608 P.2d at 641. Before a district court may consider whether sterilization is medically essential[9] or in the individual's best interest,[10] the petitioner must prove *by clear and convincing evidence* that the individual is incompetent to make a decision about sterilization and that the individual's capacity to make such a decision is not likely to improve in the future. *Wentzel v. Montgomery Gen. Hosp., Inc.*, 293 Md. 685, 447 A.2d 1244, 1253–54 (1982), *cert. denied*, 459 U.S. 1147, 103 S.Ct. 790, 74 L.Ed.2d 995 (1983); *Grady*, 426 A.2d at 482–83; *Terwilliger*, 450 A.2d at 1383; *Hayes*, 608 P.2d at 641; *see In re A.W.*, 637 P.2d at 375 & n. 20.

An individual who is incompetent to make some decisions is not necessarily incompetent to make all decisions. *Moe*, 432 N.E.2d at 721; *Grady*, 426 A.2d at 483. Implicit in our holding in *In re A.W.* was a recognition that some mentally retarded individuals are competent to grant or withhold consent to sterilization. *See* 637 P.2d at 375 n. 19. Many mentally retarded individuals are, in fact, capable of understanding the implications of sterilization and the responsibilities of parenthood, and are competent to make a decision regarding sterilization. *Grady*, 426 A.2d at 482–83.[11]

> Retardation is not co-extensive with lack of capacity to give informed consent. Most mentally retarded persons can appreciate the responsibilities of parenthood and the implications of sterilization. This is certainly true of the 90 percent who suffer from mild retardation. Likewise, many considered to be moderately retarded might also be capable of informed consent. Those who proved to be of doubtful competence could perhaps be assisted in their decision by professional counseling, provided it was strictly limited to non-coercive advice.
>
> While there is undoubtedly some point at which diminished intelligence prevents informed consent, such cases are far from common. Moreover, many retarded persons in this quite limited group are incapable of reproduction, because of physical or genetic disabilities, and others remain in protected environments which make sterilization unnecessary. In short, the state may rarely confront a retarded individual who should be sterilized, but who lacks the capacity to consent.

---

**8.** Sterilization procedures are generally irreversible. Gostin, *Consent to Involuntary and Non-medically Indicated Sterilization of Mentally Retarded Adults and Children*, in Sterilization and Mental Handicap 39 (1980) (hereinafter *Consent to Sterilization*).

**9.** In *In re A.W.*, we held that before a court may order the sterilization of a mentally retarded minor, it must find by clear and convincing evidence that sterilization is medically essential. 637 P.2d at 375.

**10.** Several courts have adopted best interests tests to determine whether to order sterilization of incompetent adults. *E.g., C.D.M.*, 627 P.2d at 612–13; *In re Debra B.*, 495 A.2d 781, 783 (Me. 1985); *Grady*, 426 A.2d at 483; *Truesdell*, 304 S.E.2d at 806–07; *Terwilliger*, 450 A.2d at 1383–84.

**11.** *See* Murdock, *Sterilization of the Retarded: A Problem or a Solution?* 62 Calif.L.Rev. 917, 933–34 (1974):

■ An individual should be deemed competent to grant or withhold consent if the individual understands the nature of the district court's proceedings, the relationship between sexual activity and reproduction and the consequences of the sterilization procedure. *See Moe*, 432 N.E.2d at 721–22 n. 8; *In re Grady*, 170 N.J.Super. 98, 405 A.2d 851, 865 (1979), *aff'd*, 85 N.J. 235, 426 A.2d 467 (1981).[12] To be competent, an individual need not have a technical understanding of bodily functions or fully understand the medical complications or risks involved in the sterilization procedure. *Moe*, 432 N.E.2d at 721–22 n. 8. Nor must the person comprehend all the risks of pregnancy and childbirth in order to be considered competent to grant or withhold consent to sterilization. *See Grady*, 405 A.2d at 865. The fact that a court finds the decision an individual would make to be unreasonable is not enough to find the individual incompetent. *See Moe*, 432 N.E.2d at 720; *Consent to Sterilization* at 40 ("If a mentally retarded person is capable of understanding that sterilization will render him/her unable to produce children and that it involves a surgical procedure, this understanding will suffice for the purpose of providing or withholding effective legal consent. The standard for determining consent does not involve an assessment by others of the cogency of the reasons for refusal.... If this were the measure of competency it would result in paternalism"); Scott, *Sterilization of Mentally Retarded Persons: Reproductive Rights and Family Privacy*, 1986 Duke L.J. 806, 840 (1986).

The seriousness of the sterilization decision merits broad appellate review. *Terwilliger*, 450 A.2d at 1384. We now must undertake such review by applying the foregoing standards to the record in the present case.

### B.

■ Although the district court found Ms. Romero incompetent to grant or withhold consent knowingly, we find that conclusion to be unsupported by clear and convincing evidence. The evidence was that Ms. Romero has an intelligence quotient (IQ) of approximately 74, which is higher than individuals who are classified as mentally retarded.[13] Individuals with similar IQs often hold jobs and live independently. *DSM–III–R* at 31.

Ms. Romero testified at the district court hearing in an articulate manner. Her testimony demonstrates that she understood the nature of the court's proceedings. Both her testimony and that of Dr. Paula Trautner, a psychiatrist, reflect that she understands the relationship between sexu-

---

12. Because the determination pursuant to §§ 15–14–101(1), 15–14–303 that an individual is incapacitated involves different criteria, it is not determinative on the question of capacity to consent to sterilization.

13. The average score on an IQ test is 100. D. Evans, *The Lives of Mentally Retarded People* 8

| IQ | Classification | Description |
| --- | --- | --- |
| 50–55 to approx. 70 | Mild | Educable; can live independently or in group homes. |
| 35–40 to 50–55 | Moderate | Trainable; require moderate supervision. |
| 20–25 to 35–40 | Severe | Able to perform simple tasks under close supervision. |
| below 20 or 25 | Profound | Require highly structured environment, with constant aid and supervision. |

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32–33 (rev. 3d ed. 1987) (hereinafter *DSM–III–R*). Individuals with IQs between 71 and 84 are considered to have "borderline intellectual functioning" and are not classified as retarded. *Id.* (1983) (hereinafter *Retarded People*). The American Psychiatric Association classifies an individual having an IQ of 70 or below as mentally retarded. The scale of abilities ranges as follows:

at 31. Commentators disagree about the value of these classifications and the use of IQ scores to define them. *Retarded People* at 8. In this case, Ms. Romero does not fit neatly into these classifications, which include only those individuals whose mental and physical impairments

al intercourse and pregnancy. Ms. Romero further demonstrated an understanding of the consequences of a tubal ligation. She expressed clearly her desire to remain capable of having another child.

Dr. Trautner was the only witness the petitioner offered to testify on the issue of competency. She testified in general terms that Ms. Romero is subject to rapid changes in mood, has poor social judgment, has episodes of anger and apathy, is sometimes paranoid, and has difficulty thinking abstractly. Although Dr. Trautner concluded that Ms. Romero is not competent to consent to sterilization, her only explanation for this conclusion was that Ms. Romero "doesn't look at things in terms of future consequences." In short, Dr. Trautner's testimony does not indicate that Ms. Romero is incapable of understanding the nature of the court proceedings, the relationship between sexual intercourse and pregnancy, or the consequences of sterilization.

Most of the testimony at the hearing focused on the reasonableness of Ms. Romero's decision to oppose sterilization and the extent of her understanding of the risks of pregnancy and childbirth rather than on her competence to grant or withhold consent. Various experts who testified concluded that it would be unwise for Ms. Romero to try to have another child, and the district court found that to be true.[14] The witnesses expressed the belief that Ms. Romero's desire to bear a child is unreasonable. Although Ms. Romero has not indicated any intention to become pregnant in the near future, she has clearly articulated her desire to remain capable of having children. She would like another child if and when she is able to leave the nursing home at which she now lives and if her diabetes becomes more manageable. Dr. Trautner testified that Ms. Romero is not realistic in assessing the risks of pregnancy and child birth or in making a judgment based on those risks, but Dr. Trautner did not state that Ms. Romero is unaware of those risks. Moreover, Ms. Romero's statement that she would like to have a child when and if her diabetes is cured indicates her understanding that pregnancy at this time would be risky.

In the final analysis, however, a court's role is not to pass judgment upon the wisdom of Ms. Romero's decision or the importance she assigns to potential risks and benefits. If Ms. Romero is competent to make a decision, she must remain free to do so, even if that means making a decision that many would consider unwise.[15]

## V.

In summary, we find the trial court's determination that Ms. Romero is incompetent to grant or withhold consent to sterilization to be unsupported by clear and convincing evidence and, therefore, we reverse the trial court's sterilization order.

MULLARKEY, J., dissents.

ERICKSON, and ROVIRA, JJ., join in the dissent.

Justice MULLARKEY, dissenting:

I respectfully dissent.

I agree with the majority's conclusion that *In re A.W.*, 637 P.2d 366 (Colo.1981), set the appropriate procedure for the trial court to follow in deciding whether to order

manifest themselves before the individuals reach eighteen years of age. *DSM–III–R* at 32.

**14.** The record demonstrates that pregnancy would be risky for Ms. Romero and a baby. Ms. Romero's fragile diabetic condition combined with pregnancy would require constant blood sugar monitoring and appropriate insulin and dietary regulation. Experts testified that Ms. Romero would not be able to maintain her health during pregnancy without considerable supervision, and that a baby might be born prematurely, as was one of Ms. Romero's previous children.

**15.** Because the record does not support a finding that Ms. Romero is incompetent to withhold consent to a sterilization procedure, we do not consider whether her capacity to make such a decision is likely to improve in the future through education, treatment or the passage of time. Our disposition of the case also makes it unnecessary to address Ms. Romero's challenge to the constitutionality of §§ 27–10.5–128, 27–10.5–130, 11B C.R.S. (1989), or her claim that less intrusive contraceptive alternatives are available.

the sterilization of La Vista Romero. *In re A.W.* provides a clear list of steps which should be followed by the district court in making such determinations. Prior to deciding the primary issue of whether to order sterilization of an incapacitated person, the district court must make the following preliminary determinations: First, the trial judge should talk to the individual in order to observe the person's physical and mental conditions; along these lines, the individual's wishes are relevant although not conclusive and should be weighed heavily. Second, the district court must determine by clear and convincing evidence that the person is incapable of making a decision about sterilization and that the person's capacity is unlikely to improve in the future. Third, the person must be proven capable of reproduction. Once a district court makes the preliminary determinations, the court must find by clear and convincing evidence that sterilization is medically essential. *Id.*, at 375.

The majority adopts the following test for determining an individual's capacity to make a decision about sterilization:

> An individual should be deemed competent to grant or withhold consent [to sterilization] if the individual understands the nature of the district court's proceedings, the relationship between sexual activity and reproduction and the consequences of the sterilization procedure.

Maj. op. at 823.

Shirley Harvey, Romero's mother and guardian, argues that the test of competency in this context requires an inquiry into the individual's capacity to understand the risks of pregnancy and childbirth. Without discussion, the majority apparently rejects Harvey's argument and states that the individual need not "comprehend all the risks of pregnancy and childbirth in order to be considered competent to grant or withhold consent to sterilization." Maj. op. at 823.

In its application of the test, however, the majority addresses Romero's understanding of the risks of pregnancy and childbirth. The majority interprets the record as supporting the conclusion that Romero is aware of and understands the risks of pregnancy and childbirth which she is willing to undertake in the future, and it notes that Romero's psychiatrist, Dr. Paula Trautner, "did not state that Ms. Romero is unaware of those risks." The majority supports its conclusion that Romero is aware and understands the risks of pregnancy by her statement that she would like to have a child when her diabetes is cured. The majority's analysis of Romero's understanding of the risks of pregnancy and childbirth shows me that such awareness is an inherent part of determining the individual's understanding of "the consequences of sterilization," which is part of the majority's test. A sexually active, fertile woman assumes the risks of becoming pregnant and bearing a child, and a woman's capacity to understand such risks as applied to herself, therefore, should enter into the court's assessment of her ability to make a sterilization decision.

The record as a whole does not support the conclusion that Romero was able to understand or actually understood the risks which pregnancy and childbirth posed to her because of her age and her severe diabetic condition. Dr. Trautner testified as to Romero's understanding of the physical consequences of pregnancy and said that "[b]asically her response is she had babies before and she can do it again and that there should not be any major problems. So, in other words, she does not have a good understanding of how the pregnancy would affect the diabetes at this point." Furthermore, when Romero was on the stand she testified as follows:

Q. Do you understand if you got pregnant that it might be risky for your health?

A. No.

Q. Because you've got diabetes it might make it unsafe for you to be pregnant?

A. It didn't hurt me the first time. I mean the second time is what I should say.

Q. Even if there was a risk would you want to get pregnant and have another baby?

A. Not at the nursing home, no.

Q. What about if you are out of the nursing home? What if you were married to Dean?

A. Yes, I would want a baby then.

Q. Even though it would be risky for you?

A. Yes. I'll take that chance.

Later the trial judge questioned Romero about her understanding of the risks involved in pregnancy and she testified as follows:

Q. You've told us that you want to have a child.

A. Yes.

Q. And the doctors have been telling me here today in the hearing that that would be very dangerous for you to do. In fact, it could be threatening to your health, or even to your life. Did you hear that testimony?

A. Yes.

Q. Does that make you feel maybe you should be more cautious or maybe you shouldn't have a baby because of what they have said?

A. No.

Q. Why is that?

A. Because I want one bad enough.

Q. Realizing that it could even kill you?

A. Yes, sir.

It appears that Romero could not connect her diabetic condition with the risks of pregnancy and childbirth. Romero asserted that pregnancy would "not be bad" for her and that her past difficulty in childbirth and the premature birth of her second child were not a result of her diabetes but rather due to her smoking. She also indicated that her diabetic condition would not be a serious limitation on her being pregnant because in the meantime a cure would be found for diabetes.

In my opinion, Romero's statements indicate that she lacks the capacity to understand the risks involved in pregnancy. Her responses to questions imply that she has an illusory view of her disease and its implications. The attorneys and medical experts at the hearing repeatedly emphasized the dangers that pregnancy and childbirth entailed, but her responses indicated that she could not relate the dangers to herself and her particular situation. Although she did state that she would like to have a child when her diabetes was cured, the context of her statement indicated her unrealistic, and perhaps wishful, assessment of her situation.

An evaluation of Romero's capacity to understand the risks of pregnancy should include consideration of whether she could comprehend the risks at a future date when she was not in the courtroom being reminded constantly of the risks. Dr. Trautner testified that Romero is subject to rapid mood changes and has difficulty thinking abstractly or in terms of future consequences. Dr. Trautner's testimony is, thus, relevant to an evaluation of Romero's capacity to understand the risks.

I would include the individual's capacity to understand the risks of pregnancy and childbirth in the test for determining one's competence to make a decision regarding sterilization. Capacity to understand, not perfect knowledge, should be the key. As the majority correctly points out at page 822, competency must be determined in context and an individual is not necessarily incompetent for all purposes. When sterilization is the issue, it is not enough for the incapacitated person to understand the nature of the district court's proceedings, the relationship between sexual activity and reproduction and the consequences of the sterilization procedure. The individual also must be able to understand the risks of childbirth and pregnancy in order to decide whether to be sterilized.

I also dissent from the majority's disposition of this case. This is a significant issue which this court addresses for the first time. The majority develops a test which was not available when the case was tried. An appellate court is in a poor position to evaluate Romero's testimony and demeanor which obviously are critical in determining her competence. The best course is to remand the case for retrial so that relevant evidence may be presented and the trial

 

court can make the initial determination of Romero's competency under the new standard.

ERICKSON and ROVIRA, JJ., join in this dissent.