IN THE MATTER OF: SOPHIA RENEE TRUESDELL

No. 8226SC482

(Filed 19 July 1983)

1. Insane Persons § 12— sterilization laws—judicial standard

To insure that the State's interest may be furthered without unnecessary and unwarranted infringement upon the mentally retarded person's rights of personal privacy, bodily integrity and autonomy in matters of conception, procreation and childbearing, the petitioner in a compulsory sterilization proceeding must meet the following standards by clear, strong and convincing evidence: (1) that the respondent is a mentally ill or retarded person subject to the sterilization statutes (G.S. Ch. 35, Art. 7); a. has a physical, mental or nervous disease or deficiency, b. the disease or mental deficiency is not likely to materially improve, and c. the respondent is likely to procreate a genetically defective child, or d. would probably be unable to care for a child or children; AND (2) the respondent is physically capable of procreation; AND (3) there is a substantial likelihood that the respondent will voluntarily or otherwise engage in sexual activity likely to cause impregnation; AND (4) the respondent is unable or unwilling to control procreation by alternative birth control or conception methods, including, but not limited to, supervision, education and training; AND (5) that the proposed method of sterilization entails the least invasion of the body of the respondent. In addition, in the case of a proposed female candidate for sterilization, the court must consider and make findings relative to the possibility that the respondent will experience trauma or psychological damage if she becomes pregnant or gives birth, and conversely, the possibility of trauma or psychological damage from the sterilization operation. The latter consideration would also be applicable to a male candidate for sterilization. These minimum basic conditions must be convincingly demonstrated when the State seeks an order of *compulsory sterilization*, for if there are other reasonable ways to achieve the legislative goals with a lesser burden on the constitutionally protected activity, the way of greater interference may not be chosen. G.S. 35-37, G.S. 35-43, and G.S. 35-39.

2. Insane Persons § 12— sterilization petition properly denied—findings and conclusions erroneous

The trial court properly denied a petition to sterilize respondent pursuant to G.S. 35-43 because the petitioner failed to meet its burden of establishing that sterilization of respondent *at this time* would further the State's interest in preventing the conception and the birth of a child whose parent is unable to adequately care for it. Petitioner failed to carry its burden of proof by clear, strong and convincing evidence that (1) there was a substantial likelihood (a) that respondent would voluntarily engage in sexual activity likely to cause impregnation or (b) would engage in sexual activity which she did not initiate; (2) that respondent was unable or unwilling to control procreation by alternative birth control or contraceptive methods; and (3) that the proposed method of sterilization entailed the least intrusive and least burdensome surgical intervention for respondent. However, because of many erroneous findings of

In re Truesdell

fact and conclusions of law pertaining to respondent's best interest and inability to use other forms of birth control, the case was remanded for entry of findings of fact and conclusions of law not inconsistent with the opinion.

APPEAL by petitioner from *Griffin, Judge.* Order entered 18 December 1981 in Superior Court, MECKLENBURG County. Heard in the Court of Appeals 16 March 1983.

Petitioner, Mecklenburg County Department of Social Services (DSS), initially instituted this action by a petition filed on 30 March 1977, and amended on 18 June 1980, pursuant to G.S. 35-36, *et seq.,* requesting the sterilization of respondent, Sophia Renee Truesdell on the ground that she is mentally deficient without any hope of improvement, and that as a result of said deficiency Sophia will never be able to provide adequate care for a child or children, and that sterilization would be in the best interests of both the State and the respondent. A guardian ad litem was appointed for the respondent on 30 May 1980 by District Court Judge William G. Jones. On 27 June 1980, the guardian ad litem filed an objection to the petition for sterilization. Following a hearing on the matter, Judge Jones denied the petition, concluding as a matter of law, and construing G.S. 35-36, *et seq.* to require clear, strong, and convincing evidence that *inter alia* the respondent is likely to engage in sexual activity before sterilization may be ordered. The court specifically found that there was no evidence that the respondent was likely to engage in any sexual activity with any male and made further findings which, taken together, indicated the lack of a substantial risk of exposure to sexual activity in light of respondent's character, behavior and daily schedule. Petitioner gave notice of appeal, and a trial *de novo* was held in Superior Court.

At the *de novo* hearing in Superior Court, Edward C. Holscher, M.D., qualified as an expert in psychiatry and child psychiatry, and Charles E. Warner, M.D., qualified as an expert in the field of medicine with emphasis in pediatrics, gave extensive testimony directed to the question of whether respondent's condition met the statutory elements required by G.S. 35-43 and the broader question of whether a sterilization was in respondent's best interest. Although Dr. Holscher had only seen respondent once, for a 45-minute psychiatric evaluation, he testified to the effect that sterilization by hysterectomy would be in respondent's

best interest. Additional testimony was received from Daisy Vance, respondent's caretaker and from persons who work with respondent during the daytime at a school for the mentally handicapped. Judge Griffin denied DSS's petition, *inter alia* finding as a fact and concluding as a matter of law that before a sterilization may be ordered there must be a showing that respondent is likely to engage in sexual activity without using contraceptive devices and that in respondent Truesdell's case there is no evidence that she is likely, at present, to engage in sexual activity. From entry of this order, petitioner appeals.

*Ruff, Bond, Cobb, Wade and McNair, by Moses Luski, for petitioner appellant.*

*Assistant Public Defender Eben Rawls, for respondent appellee.*

JOHNSON, Judge.

The question presented for review is whether the trial court erred in denying the petition for involuntary sterilization by applying inappropriate legal and constitutional tests. For the reasons set forth below, we hold that the trial court correctly denied the petition for involuntary sterilization because the standards that must be applied to all involuntary sterilizations of the mentally retarded or mentally deficient clearly exclude the respondent, Sophia Renee Truesdell.

I

The undisputed relevant facts as they appear in the record are as follows: Petitioner DSS first instituted this proceeding for involuntary sterilization of respondent, Sophia Truesdell (Sophie) in 1977, when she was 13 years of age. At the time of trial, Sophie was 18 years old. Sophie is a severely retarded individual with a mental age of three to five years and an I.Q. of approximately 30. Her level of intellectual functioning will not materially improve over time. The expert health professionals indicated that Sophie suffers from a severe impairment of adaptive behavior, including basic social skills, which also will not materially improve over time. These deficiencies render Sophie unable to (1) effectively recognize and report her own bodily symptoms, and determine whether medical treatment is warranted and (2) attend to essen-

In re Truesdell

tial self-help activities such as personal hygiene and health care, shopping, cooking and financial management. Thus, Sophie is unable to exist without significant assistance from others, and could only be expected to live in a social setting in which she had very close supervision, including supervision that her basic needs for food, clothing and personal hygiene were met. In the opinion of the professionals who testified, Sophie's mental deficiencies render her unable, on her own, to care for the needs of a child or children.

Sophie suffers from a degree of psycho-motor impairment, and walks with a somewhat unsteady gait. However, her physical development is commensurate with her chronological age. There is no medical indication that she is infertile. Her regular monthly menstruation makes it reasonable to assume that Sophie ovulates and is, therefore, fertile.

Currently, Sophie resides with Daisy Vance, who was Sophie's foster parent while she was under the jurisdiction of the juvenile courts, and who now serves in a voluntary capacity as Sophie's caretaker. Ms. Vance tends to all of Sophie's needs. During the day, Sophie attends the Metro Center School, a facility for the trainable mentally retarded, where she receives instruction in basic academic, self-help and social skills. She rides the bus to and from school, and never leaves home or school except in the company of school authorities or her foster mother. Sophie has never run away from home. Her instructors describe her as extremely shy, withdrawn and quiet young lady who keeps rather to herself. She has never wandered away from her classrooms, never inappropriately taken off her clothes, and never performed or demonstrated any sexual activity with any members of the class at the Metro School to the knowledge of her instructors. Daisy Vance testified that at times she had observed Sophie rubbing her genital area during her menstruation, and some years prior had observed other such conduct of a sexual nature, but that she had gotten Sophie to stop most of this activity, except possibly some self-stimulation in the privacy of her own room and bed.

At one time, Sophie participated in a social living skills program at the Mecklenburg County Center for Human Development. The class she attended was designed to help students with problems with social skills. The Center's unit supervisor testified

that a goal for each client in the program was to promote social interaction in a highly structured, well-monitored situation; some physical interaction is permitted in furtherance of these goals. Although Sophie was never reported as having initiated any physical contact whatsoever with any of the male clients at the Center for Human Development, one young man there viewed Sophie as his "girlfriend," and was observed putting his arm around her shoulder. No evidence was presented that Sophie was sexually active or had been sexually exploited.

The trial court also received extensive testimony relative to Sophie's menstruation, medical opinion on her ability to utilize various forms of birth control and on the effects and advisability of sterilization by means of hysterectomy.

At the conclusion of the evidence at the trial, Judge Griffin indicated that he would deny the petition for sterilization. However, the record discloses that the trial judge requested that the attorney for the petitioner, DSS, prepare the Findings of Fact and Conclusions of Law despite the fact that the judge had held for respondent, and against petitioner. Findings of Fact Nos. 1 through 10 concern Sophie's limited mental and social development. Finding of Fact No. 2 specifically finds that respondent lacks the capacity to consent to the requested sterilization due to her mental deficiencies. Findings of Fact Nos. 11 through 16 concern Sophie's menstruation and the physical effects of a hysterectomy. Findings of Fact Nos. 16, 17 and 18 relate to her rudimentary sexual drive and social interactions at school. Finding of Fact No. 19 concerns other students at the Metro Center, and Finding of Fact No. 20 speculates as to Sophie's possible reaction to sexual exploitation. Finding of Fact No. 21 states:

> Notwithstanding Findings of Fact 16 through 20, there is no evidence that Respondent, at present, is likely to engage in sexual activity.

Findings of Fact Nos. 22, 23, and 24 concern the unavailability of other forms of birth control as less drastic alternatives to sterilization; Findings of Fact Nos. 25 through 28, possible adverse consequences of pregnancy; Finding of Fact No. 29 states that respondent's mental retardation renders her unable to provide a minimal level of care for a child or children; that she will never be able to care for herself, let alone children. Findings of

Fact Nos. 30, 32, and 33 are in the form of conclusions that: "respondent's menstruation and fertility constitute more of a burden than a benefit to her," that sterilization by hysterectomy would be in the best interests of respondent, so as to outweigh the loss of fertility, and that despite the lack of evidence of sexual activity, hysterectomy constitutes a sound exercise of preventive medicine in the opinion of the medical experts.

Based upon the foregoing findings of fact, the court concluded as a matter of law that,

A. Respondent is subject to N.C.G.S. 35-43;

B. That she suffers from a mental disease or deficiency, not likely to materially improve;

C. Which renders her unable to care for a child or children;

D. That sterilization would be in the best interest of Respondent.

These conclusions notwithstanding, the court further concluded that the decision in *N.C. Association for Retarded Children v. State of North Carolina,* 420 F. Supp. 451 (M.D.N.C. 1976) precludes it from granting petitioner's request for sterilization.

Said decision indicates that before a sterilization may be granted there must be a showing that Respondent is "likely to engage in sexual activity without using contraceptive devices." In the instant case there is no evidence that Respondent is likely, at present, to engage in sexual activity . . . [T]herefore . . . Petitioner's request for the sterilization of Respondent [is] denied.

G.S. 35-39 (Cum. Supp. 1981) states that it shall be the duty of the petitioner (county director of Social Services) to institute sterilization proceedings under the following circumstances:

(1) When in his opinion it is for the best interest of the mental, moral or physical improvement of the patient, resident of an institution, or noninstitutional individual, that he or she be sterilized.

(2) When in his opinion it is for the public good that such patient, resident of an institution, or noninstitutional individual be sterilized.

(3) When in his opinion such patient, resident of an institution, or noninstitutional individual would be likely, unless sterilized,

    a. To procreate a child or children who would have a tendency to serious physical, mental, or nervous disease or deficiency; or,

    b. Because of a physical, mental, or nervous disease or deficiency which is not likely to materially improve, the person would be unable to care for a child or children. (Spacing and letters added.)

Before the judge may enter an order requiring that the sterilization operation be performed, he must make the findings of fact required by G.S. 35-43, which amounts to a judicial determination that the allegations contained in the petition are true. *N.C. Association for Retarded Children, supra* at 456. The language of G.S. 35-43 is literally a mirror-image of G.S. 35-39(3). That section requires judicial findings that because of mental disease or deficiency which is not likely to materially improve,

    a. The person would probably be unable to care for a child or children, or

    b. Because the person would be likely, unless sterilized, to procreate a child or children which probably would have serious physical, mental, or nervous diseases or deficiencies. (Spacing and letters added.)

Curiously, the two additional grounds for instituting sterilization proceedings stated in G.S. 35-39, the best interests of the State and the retarded individual, are not included in G.S. 35-43.

Petitioner-appellant argues that the trial court erred in concluding that a showing of sexual activity on the part of the respondent is required before sterilization may be ordered pursuant to G.S. 35-43. Petitioner contends that this is an "additional" standard imposed on the North Carolina statutory scheme by a federal court in an "unprincipled exercise in judicial legislation;" that the decision in *N.C. Association for Retarded Children v. State of North Carolina, supra,* has no binding precedential value on this Court; and that application of that decision in Sophie's case would violate her constitutional right to obtain a steriliza-

tion. Petitioner further contends that the findings of fact made by the trial court far exceeded the standards set by G.S. 35-43, and the decisions of *In re Moore*, 289 N.C. 95, 221 S.E. 2d 307 (1976) and *In re Johnson*, 45 N.C. App. 649, 263 S.E. 2d 805, *disc. rev. denied*, 300 N.C. 373, 267 S.E. 2d 686 (1980), for the granting of a sterilization petition, thereby requiring the trial court, as a matter of law, to grant rather than deny, the sterilization petition. According to the petitioner, G.S. 35-43 requires *only* a showing that (1) the respondent suffers from a mental disease not likely to materially improve, (2) which renders respondent unable to care for a child or children, and that such a showing establishes a compelling state interest in the sterilization of respondent. In addition, petitioner contends that sterilization is in the respondent's best interests.

Respondent argues that the correct legal and constitutional standards were applied by the trial court and that should an order of sterilization be entered on the findings of fact in this case, the statutes as applied would impermissibly infringe upon Sophie's fundamental right to procreate. Further, that the findings of fact relied upon by petitioner in support of an order of involuntary sterilization are erroneous, not supported by clear, strong and convincing evidence, irrelevant, and immaterial to the issues before the court. Respondent requests that these findings be stricken from the record and disregarded in deciding this appeal.

We begin with the issues raised concerning the findings of fact by the trial court. The trial judge requested that the attorney for the petitioner, Department of Social Services, prepare the findings of fact and conclusions of law despite the fact that the judge had held for respondent, and against petitioner. The petitioner's proposed findings and conclusions were then directly submitted to the presiding judge who read and signed them on 18 December 1981. That same day, the guardian ad litem for respondent submitted his own set of proposed findings of fact and conclusions of law. The guardian also promptly entered written objections to the findings of fact contained in Judge Griffin's order on the grounds that he was not shown a copy of the proposed findings and conclusions prior to their submission to the judge and specifically on the grounds that Findings of Fact Nos. 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 25, 26, 27, 28, 29, 30,

32 and 33 are not supported by clear, cogent, and convincing evidence, and are immaterial and irrelevant. The findings of fact specifically objected to, taken as a whole, formed the basis of the court's conclusion of law that sterilization by hysterectomy would be in the best interest of respondent.

Due to the unusual procedure by which the unsuccessful petitioner was allowed to prepare the proposed findings and conclusions, the successful respondent sought to raise the question of the sufficiency of the factual findings as to Sophie's best interests and her inability to use other forms of birth control, by presenting the question in the appellate brief. Additionally, the respondent's written objection to the findings, containing a statement of the error complained of and the grounds upon which the objection was taken, was included in the record on appeal. Petitioner filed a reply brief contending that the respondent-appellee failed to properly preserve the question for review by failing to note any "exceptions," or make any "cross-assignments of error" in the record on appeal pursuant to Rule 10(a) and (d) of the Rules of Appellate Procedure. We disagree.

As the commentary to Rule 10(a) indicates, the underlying purpose behind the exception/assignment of error process is to limit the scope of appellate review to (1) errors which have been first suggested to the trial judge in time for him to avoid or to correct them; and (2) to signal the adversary the points of law which will be urged on appeal. By the further restriction that the exceptions and assignments of error must be formally presented for review as "questions" in the written brief, the ultimate scope of review is defined. But for the labels "exception" and "cross-assignment of error," the procedure followed by the respondent in this case substantially complies in every respect with requirements of Rule 10. Therefore, the question presented as to the sufficiency of the evidence supporting the findings of fact is properly before this Court, and will be considered where appropriate in the course of reviewing the trial court's denial of the sterilization petition.

## II

At the outset, we note that in considering the prospect of sterilization, a court must take particular care to protect the rights of the mentally impaired. Of late, increased attention has

been focused on those rights from public authorities in this country. *See e.g.*, 42 U.S.C.A. § 6000 *et seq.*; Ferster, *Eliminating the Unfit—Is Sterilization the Answer?*, 27 Ohio St. L.J. 591 (1966); *cf. Parham v. J.R.*, 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed. 2d 101 (1979) (due process requirements of state commitment procedures); *see generally*, P. Friedman, *The Rights of Mentally Retarded Persons* (1976). In addition, sterilization not only affects the individual's fundamental right to procreate, recognized by the United States Supreme Court in *Skinner v. Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), it forever deprives the individual of that basic liberty. Therefore, the equal protection clause of the Fourteenth Amendment requires strict scrutiny of both the classification of those subject to the involuntary sterilization laws, as well as the application of that classification, to ensure that the statute as drawn and applied does not have an impermissibly discriminatory effect upon the subject individual's exercise of his or her fundamental rights. *Skinner v. Oklahoma, supra; Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). In *Skinner*, the Supreme Court applied the strict scrutiny test and struck down the Oklahoma Habitual Criminal Sterilization Act on the grounds that the classification of those to be sterilized invidiously discriminated against certain types of individuals in the exercise of a fundamental right. Justice Douglas, writing for the Court, stated:

> We are dealing here with legislation which involves one of the basic civil rights of man. Marriage and procreation are fundamental to the very existence and survival of the race. The power to sterilize, if exercised, may have subtle, far-reaching and devastating effects. In evil or reckless hands it can cause races or types which are inimical to the dominant group to wither and disappear. There is no redemption for the individual whom the law touches. Any experiment which the State conducts is to his irreparable injury. He is forever deprived of a basic liberty.

316 U.S. at 541, 62 S.Ct. at 1113, 86 L.Ed. at 1660. Justice Douglas went on to state that, although the majority did not question the scope of the police power of the state, the fundamental nature of the right to procreate necessitated the Court's strict scrutiny of the classification which a state makes in a sterilization law, "lest unwittingly or otherwise invidious discriminations [be] made

against groups or types of individuals in violation of the constitutional guaranty of just and equal laws." *Id.*[1]

*Skinner v. Oklahoma, supra,* is recognized as a forerunner of the special protection of some "fundamental interests" under the equal protection clause. In *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed. 2d 551 (1972), the right to conceive and raise one's children was found to be fundamental, and, as such, to warrant protection under the Fourteenth Amendment. Beginning with *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed. 2d 510 (1965), the United States Supreme Court has given constitutional recognition to the right of personal autonomy over procreation and contraception. In *Griswold,* the Court sought to shield the right of privacy in marriage from governmental intrusion in the form of a law forbidding the use of contraceptives. A substantive right of privacy was given form out of the "penumbras" of the Bill of Rights. *Id.* at 484, 85 S.Ct. at 1681, 14 L.Ed. 2d at 514. Since *Griswold,* the Supreme Court has repeatedly stated that the broad right of privacy entails the right of the *individual* "to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird,* 405 U.S. 438, 453, 92 S.Ct. 1029, 1058, 31 L.Ed. 2d 349, 362 (1972). Involuntary sterilization directly threatens that right, *Skinner v. Oklahoma, supra.* In *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed. 2d 147 (1973), the Court stated that the Constitution guarantees certain "zones of privacy," and that its previous decisions make it clear that the right of personal privacy also extends to activities relating to marriage, procreation, contraception, family relationships and child rearing and education. Further, that this right of personal privacy was broad enough to encompass a woman's decision whether or not to terminate her pregnancy, which the state may not altogether deny or unnecessarily burden in furthering its legitimate interest in protecting potential life. 410 U.S. at 152-153,

1. Chief Justice Stone concurred in the result reached on the grounds that the statute violated due process by not affording the opportunity to any individual member of the subject class to show that he is not the type of case which would justify resort to such an invasion of personal liberty as involuntary sterilization. Justice Jackson concurred on both grounds, while also indicating that scientific uncertainty about the transmissibility of certain characteristics raised grave doubts as to the constitutionality of any eugenic sterilization statute. 316 U.S. at 543-546, 62 S.Ct. at 1114-1116, 86 L.Ed. at 1661-1663.

93 S.Ct. at 726-727, 35 L.Ed. 2d at 176-177. "Where certain 'fundamental rights' are involved, the Court has held that regulation limiting these rights may be justified only by a 'compelling state interest' (citations omitted) and that legislative enactments must be narrowly drawn to express only the legitimate state interests at stake." *Id.* at 155, 93 S.Ct. at 728, 35 L.Ed. 2d at 178. In *Carey v. Population Services International,* 431 U.S. 678, 685-686, 97 S.Ct. 2010, 2016-2017, 52 L.Ed. 2d 675, 684-685 (1977), Justice Brennan, again invoking the right of privacy to make certain personal decisions without unjustified governmental interference, stated:

> The decision whether or not to beget or bear a child is at the very heart of this cluster of constitutionally protected choices . . . [T]his is understandable, for in a field that by definition concerns the most intimate of human activities and relationships, decisions whether to accomplish or prevent conception are among the most private and sensitive . . . "[C]ompelling" is of course the key word; where a decision as fundamental as that whether to bear or beget a child is involved, regulations imposing a burden on it may be justified only by compelling state interests, and must be narrowly drawn to express only those interests. (Citations omitted.)

The principles developed in *Roe* and its progeny were recently reaffirmed by the Supreme Court in *Akron v. Akron Center for Reproductive Health, Inc.,* --- U.S. ---, 103 S.Ct. 2481, --- L.Ed. 2d 687 (1983) invalidating a number of state laws regulating the abortion procedure on the grounds that they unconstitutionally burdened the exercise of a woman's fundamental right to make the highly personal choice whether or not to terminate her pregnancy. Justice Powell, writing for the Court, again endorsed the *Roe* recognition that an individual's "freedom of personal choice in matters of marriage and family life," occupies a central place among the liberties protected by the due process clause, 410 U.S. at 169, 93 S.Ct. at 735, 35 L.Ed. 2d at 194 (Stewart, J., concurring); that the state does have an "important and legitimate interest in protecting the potentiality of human life," *id.* at 162, 93 S.Ct. at 731, 35 L. Ed. 2d at 182; but that *searching judicial examination* of the abortion regulations enacted is necessary to ensure that the state meets its burden of demonstrating that the regulations actually furthered the state's interests. In the *Akron* case itself, one of the regulations invalidated required that all second tri-

mester abortions be performed in a hospital. The Court stated that under *Roe*, after the end of the first trimester of pregnancy the state's interest in maternal health becomes compelling and it may, therefore, regulate the abortion procedure to the extent that the regulation reasonably relates to that end. In addition, that the state's interest in the potential life of the fetus is also implicated during the second trimester, however, the Court held that the state may not broadly regulate the *entire trimester.*

> Rather, the State is obligated to make a reasonable effort to *limit the effect of its regulations to the period in the trimester during which its health interest will be furthered.* (Emphasis added.)

--- U.S. at ---, 103 S.Ct. at 2495, 76 L.Ed. 2d at 706. The Court concluded that the indiscriminate temporal sweep of the regulation placed a significant obstacle in the path of a woman seeking an abortion without furthering the state's purpose. Thus, a state may enact regulations which reasonably burden a fundamental right, but the regulation must be narrowly drawn to affect that right *only at such times* when the regulation will palpably further the state's interest. The Supreme Court thereby reaffirmed the principle that not only must the means chosen by the state bear a fair and substantial relation to the ends sought, but the legislation must not unnecessarily impair the fundamental personal decisional right affected.

> In a series of decisions this Court has held that, even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose.

*Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed. 2d 231, 237 (1960).

Although the constitutionality of G.S., Chapter 35, Article 7, "Sterilization of Persons Mentally Ill or Mentally Retarded," as drawn is not here questioned, the constitutionality of the statutory scheme as applied to respondent is at issue in this appeal. Thus, the question becomes, at what point in time will the

state's interest in preventing the procreation of a child whose parent is unable to care for it due to mental retardation be furthered so as to warrant the exercise of its power to involuntarily sterilize the mentally retarded person. In other words, under what circumstances does involuntary sterilization under G.S. 35-36 *et seq.* become justified and appropriate? A brief history of the treatment of Article 7 in the courts thus far is necessary for a full understanding of the issues presented by this appeal.

## A

The statutory scheme first survived a broad-based constitutional attack in *In re Moore, supra.* The petitioner requested the court to enter an order authorizing the sterilization of Joseph Lee Moore, a minor, by means of a vasectomy, on the ground that unless sterilized he woud procreate a child or children who would probably have serious physical, mental, or nervous diseases or deficiencies. The petition was accompanied by the consent of respondent Moore and the consent of his mother. Later, respondent Moore, through his guardian ad litem and attorney, filed a motion to dismiss the petition, alleging that G.S. 35-36, *et seq.* was unconstitutional. The motion was allowed and the petitioner (DSS) appealed.

The sole issue on appeal was the constitutionality of the statutory scheme as drawn. The Supreme Court concluded that the provisions of Article 7 did not offend the equal protection clauses of the United States or North Carolina Constitutions since they provide for the sterilization of all mentally ill or retarded persons inside or outside an institution who meet the requirements of the statutes. Further, that the hearing procedures provided for by the statutes protected the procedural due process rights of the mentally retarded, and the statutes substantively constituted a valid and reasonable exercise of the State's police power since the State has a compelling interest to prevent the procreation of children by a mentally ill or retarded person who would probably be unable to care for children and the procreation of children who probably would have serious physical, mental, or nervous diseases or deficiencies.

As to the former ground for sterilization, the Court reasoned that the State's interest in the welfare of the unborn child is suffi-

cient to warrant sterilization of a retarded individual, as is the State's interest in preventing the procreation of children who will become a burden on the State. 289 N.C. at 102-103, 221 S.E. 2d at 312, *citing Cook v. State,* 9 Or. App. 224, 495 P. 2d 768 (1972) and *In re Cavitt,* 182 Neb. 712, 157 N.W. 2d 171 (1968). As to the latter ground, the Court relied upon the United States Supreme Court decision in *Buck v. Bell,* 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000 (1927) to establish the State's paramount interest in preventing the conception of a genetically defective child.[2]

The court also noted conditions under which it may be in the best interests of the mentally retarded individual to be sterilized.

The mentally ill or retarded individual may not be capable of determining his inability to cope with children. In addition, he may be capable of functioning in society and caring for his own needs but may be unable to handle the additional responsibility of children. *This individual also may not be able to practice other forms of birth control and therefore sterilization is the only available remedy.* Sterilization itself does not prevent the normal sex drive of the person, it only prevents procreation. Therefore, the State may only be pro-

---

2. In *Buck v. Bell, supra,* Justice Holmes, writing for the Court accepted the basic premises of the eugenic theory that persons with certain diseases or anti-social characteristics have offspring who inherit the parental defect, tend to procreate more often and do not view sterilization as detrimental so that sterilization of the unfit would promote the general health and welfare of society. *See Id.* at 207, 47 S.Ct. at 585, 71 L.Ed. at 1002; Ferster, *supra* at 602. All of the underlying premises of eugenic sterilization, however, have been vigorously criticized and, for the most part, have proven false. *See Matter of A.W.,* 637 P. 2d 366 (Colo. 1981); Ferster, *supra* at 602-604; Kindregan, Sixty Years of Compulsory Eugenic Sterilization: "Three Generations of Imbeciles" and the Constitution of the United States , 43 Chi. - Kent L. Rev. 123, 134-140 (1966). *See also Skinner v. Oklahoma, supra* at 546, 62 S.Ct. at 1115, 86 L.Ed. at 1663 (Jackson, J., concurring). In Note, *Legislative Naivete in Involuntary Sterilization Laws,* 12 Wake For. L. Rev. 1064 (1976), the author, at 1070-1075, has criticized the *Moore* court's reliance upon *Buck v. Bell, supra,* in part because the individual's competing right to procreate was not given sufficient emphasis by Justice Holmes. The author also analyzed the reasoning of *In re Moore* in light of current constitutional protections and criticizes *inter alia,* the *Moore* court's focusing on the State's right to promote the general good while failing to give adequate weight to the countervailing consideration of the individual's fundamental right to procreate. Thus, the author concludes that the *Moore* analysis closely approximates a "rational basis" standard of review, rather than the "strict scrutiny" required when legislation works a "palpable invasion of a right secured by fundamental law." *Id.* at 1073.

viding for the welfare of the individual when this individual is unable to do so for himself. (Emphasis added.)

289 N.C. at 104, 221 S.E. 2d at 312-313. The respondent's contention that G.S. 36-43 was unconstitutionally vague and arbitrary because it lacked adequate judicial standards to guide the court in reaching a decision on the sterilization petition was rejected. The Court conceded that the statutes contained some uncertain language and ambiguity. However, citing the traditional principles of statutory construction as stated in *Hobbs v. Moore County*, 267 N.C. 665, 149 S.E. 2d 1 (1966) and *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed. 2d 15 (1974), the Court stated that it is the duty of the court to construe a statute, ambiguous in its meaning, so as to give effect to the legislative intent. The legislative intent was found to be the provision of sufficient safeguards to prevent misuse of the potentially dangerous sterilization procedure, and the meaning of terms such as "likely" to procreate and "probably" be unable to care, as used in G.S. 35-36 *et seq.*, sufficiently subject to objective determination and sufficiently understandable to be complied with. In order to further the legislative intent to protect the fundamental rights of the individual, the Court held that the evidence must be clear, strong and convincing before such an order may be entered. *Id.* at 106-108, 221 S.E. 2d at 314-315.

The statutory scheme survived another broad constitutional challenge in *N.C. Association for Retarded Children v. State of North Carolina, supra*, with two significant exceptions. Subdivision (4) of G.S. 35-39 (subsequently repealed by Session Laws, 1981) which provided that the appropriate public official should initiate proceedings, "[w]hen requested to do so in writing by the next of kin or legal guardian of such patient, resident of an institution, or noninstitutional individual," was held to be an arbitrary and capricious delegation of unbridled power. 420 F. Supp. at 456. The second, and more pertinent action of the federal court was to specifically construe G.S. 35-43 to mean that before an order of sterilization can be entered, the judge must find from evidence that is clear, strong and convincing, that the subject is likely to engage in sexual activity without utilizing contraceptive devices and is, therefore, likely to impregnate or become impregnated.

We derive that meaning from the clause of the statute saying ". . . because the person would be likely, unless sterilized, to procreate a child or children . . ." Although the phrase is not contained in the prior clause, *it must have been the sense of the legislature to require only that which is necessary, and unless sexual activity and inability or unwillingness to utilize contraception is indicated by the evidence, there would be no occasion for resort to sterilization.* (Emphasis added.)

420 F. Supp. at 456-457. Rejecting arguments that the statute was overbroad and vague, the court repeated this narrowing interpretation in order to uphold the legislative classification of mentally retarded persons on equal protection grounds. After observing that sterilization is a "drastic procedure, almost impossible to reverse in females and difficult and uncertain to reverse in males . . . intended to be permanent and prevent procreation," *id.* at 454, the court made the following findings of fact pertinent to the legislative classification at issue:

[I]t is in some cases possible to predict with substantial accuracy that a mentally retarded person would be incapable of discharing the responsiblities of parenthood.

*       *       *

While mentally retarded persons may be entitled to express themselves sexually, it can in some cases be determined that a mentally defective person does not understand or cannot appreciate the natural consequences of sexual activity. It can, likewise, be determined in some cases that the conception of a child is neither the intention nor the expectation of the sexually active mental retardate.

*       *       *

Some mentally retarded persons who are sexually active may not want children. While many sexually active retarded persons are capable of employing various methods of birth control effectively, some are incapable of effective voluntary contraception.

*       *       *

In rare and unusual cases, it can be medically determined that involuntary sterilization is in the best interests of either

the mentally retarded person or the state or both. (Emphasis added.)

420 F. Supp. at 455. Based upon this and other findings, the legislative classification of G.S. 35-36 *et seq.* was upheld. The classification was found to rest upon respectable medical knowledge and opinion that mentally retarded persons are in fact different from the general population and may rationally be accorded different treatment for their benefit and the benefit of the public.

> Moreover, the classification is itself narrowed as to impact so that, as we interpret it, only mentally retarded persons who are sexually active, and unwilling or incapable of controlling procreation by other contraceptive means, *and* who are found to be likely to procreate a defective child *or* who would be unable because of the degree of retardation to be able to care for a child, may be sterilized. (Emphasis original.)

420 F. Supp. at 457. Therefore, the legislative dual purpose — to prevent the birth of a defective child or the birth of a nondefective child that cannot be cared for by its parent — was found to reflect a compelling state interest sufficient to satisfy the requirements of *both* substantive due process and equal protection *only* when the statute is thus narrowly interpreted. The decision in *N.C. Association for Retarded Children* formed the basis for the trial court's denial of DSS' petition in the case *sub judice.*

The involuntary sterilization issue was presented to this Court in *In re Johnson, supra.* Judge Clark, writing for the court, noted that although the sterilization statutes as drawn have been determined to meet the tests of constitutionality, "the absence of standards and statutory definitions requires that the courts construe and apply the statutory provisions to the evidence in each case so as to adequately protect the respondent's fundamental rights." 45 N.C. App. at 652, 267 S.E. 2d at 808. Stressing the need to rely on what the evidence indicated, the court ruled that the mere fact of retardation does not render a person presumptively unfit to parent children so as to require an order of sterilization. *Id.* at 653, 267 S.E. 2d at 809, *citing Cleveland Board of Education v. La Fleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed. 2d 52 (1974). Rather, all the evidence was closely examined to determine fitness and the compelling need for sterilization. Testimony

by respondent's social worker, psychiatrist and foster mother in-
dicated that when the 23 year old respondent was 18 years of age
she was involved with several men, but was unable either to
understand birth control methods or to comprehend that she
could become pregnant from sexual intercourse; an intrauterine
device (IUD) was inserted at the behest of DSS, but respondent
had it removed; according to her foster mother, respondent went
out every night, had boyfriends, and refused to take birth control
pills; respondent had already had one abortion; the doctor
testified that one of respondent's boyfriends wanted to marry her
and that she had indicated the desire to have children. The
respondent was often either impatient with children or appeared
totally disinterested in them. Both the social worker and foster
mother were of the opinion that respondent was unable to look
after or care for a child. The grant of petitioner's request for
sterilization was upheld on the grounds that the petitioner met
its burden of proof by presenting clear, strong and convincing
evidence that in addition to her mild mental retardation, over a
period of years the respondent had exhibited emotional immaturi-
ty, a lack of patient with children, and continuous nightly adven-
tures with boyfriends.

From the foregoing evidence and conclusion based thereon, it
appears that this Court has already implicitly accepted the inter-
pretation given G.S. 35-43 by the federal court in *N.C. Association
for Retarded Children*, that before a sterilization can be ordered
there must be a showing that the subject be shown to be likely to
engage in sexual activity without utilizing contraceptive devices
and is, therefore, likely to become impregnated.

B

The petitioner contends that the trial court erred in applying
the construction of G.S. 35-43 found in *N.C. Association for
Retarded Children, supra*. We disagree.

As a preliminary matter, it is clear that the questioned inter-
pretation was reached in order to avoid an infirmity under the
federal constitution and, as such, constitutes a decision on federal
constitutional law. Our Supreme Court recognized that the
sterilization statutes, G.S. 35-43 in particular, contain certain am-
biguities in phrasing and uncertainty in terminology. 289 N.C. at
108, 221 S.E. 2d at 315. However, the court recognized (1) the

duty of the courts to construe a statute, ambiguous in its meaning, so as to give effect to the legislative intent, and (2) that where a statute is susceptible of two interpretations, one of which will render it constitutional and the other will render it unconstitutional, the former will be adopted. 289 N.C. at 106, 221 S.E. 2d at 314. The ambiguity at issue in G.S. 35-43 is at least in part created by the omission of the words "likely to procreate" preceding the parental unfitness ground for sterilization. This issue was not specifically addressed by the court in *Moore* because sterilization of Joseph Moore was sought on the eugenic justification that, unless sterilized, he would be likely to procreate a defective child. The reported decision does not contain any discussion of Moore's home life or social activities. However, the respondent's mother had consented to the sterilization, and the Court stated that, "his mother unquestionably is in a position to know what is best for the future of her child." 289 N.C. at 109, 221 S.E. 2d at 316. In addition, the court cited with approval the case of *Cook v. State, supra.* In *Cook*, the respondent was both mentally ill and mentally retarded. As a child she had been physically and sexually abused by her family. The petition to sterilize the respondent was filed only after she had engaged in a series of indiscriminate and impulsive sexual involvements while she was in the State Hospital. 495 P. 2d at 770. Under these conditions, the *Cook* court found strong evidence that the respondent was a potential parent whose inability to care for a child due to mental illness and retardation presented a threat of immediate harm to a vital state interest — the public health and welfare. Thus, a compelling state interest in the sterilization of a particular mentally retarded individual would seem to require that conditions created by the party against whom the State seeks to act must create a threat of immediate harm to that interest. It must be shown that procreation is now at risk. *See Akron v. Akron Center for Reproductive Health, Inc., supra. See generally* Note, 12 Wake For. L. Rev., *supra* at 1075; Sherlock, *Sterilizing The Retarded: Constitutional, Statutory and Policy Alternatives*, 60 N.C. L. Rev. 943, 970 (1982).

Petitioner argues, in effect, that it is sufficient to show only (1) procreative capacity and (2) the prospective unfitness of the potential parent to justify sterilization. We reject this interpretation of G.S. 35-43 as it would raise serious constitutional ques-

tions. The existence of a situation justifying sterilization depends upon more than a bare capacity for procreation. Logic and reason indicate that unless and until a person is sexually active, there is no likelihood that the person will procreate a child and, unless and until procreation has occurred, there is no likelihood that the person will be a biological parent, fit or unfit. We are persuaded by the reasoning of the federal court in *N.C. Association for Retarded Children* that, "it must have been the sense of the legislature to require only that which is necessary, and unless sexual activity and inability or unwillingness to utilize contraception is indicated by the evidence, there would be no occasion for resort to sterilization." 420 F. Supp. at 457. Furthermore, as other courts have observed, sterilization of the mentally retarded is a drastic and extraordinary means of contraception, a means to prevent birth that "as it is now understood by medical science is . . . substantially irreversible." *Matter of Guardianship of Eberhardy,* 102 Wis. 2d 539, 307 N.W. 2d 881, 894 (1981); *Matter of Moe,* 385 Mass. 555, 432 N.E. 2d 712, 716-717 (1982).

[1] Thus, sterilization irreparably deprives a person of the capacity to exercise a fundamental right and great care must be taken to determine whether the respondent is an appropriate candidate. As the court in *N.C. Asociation for Retarded Children* found, involuntary sterilization will be in the best interests of either the mentally retarded person, or the State or both only in *rare and unusual* cases. The concededly legitimate purpose to be achieved by compulsory sterilization here is the prevention of the birth of a child to a person who would be incapable of discharging the responsibilities of parenthood due to mental retardation. *In re Moore, supra; N.C. Association for Retarded Children, supra.*[3]

---

3. *Compare Matter of A.W.,* 637 P. 2d at 368-369 ("Today, compulsory sterilization based on eugenic theories can no longer be justified as a valid exercise of governmental authority . . . [It] would be an unconstitutional infringement of the fundamental right to procreate"); *Matter of Moe, supra* at 717. ("The State has no recognizable interest in compelling the sterilization of its citizens.") *Accord In re Grady,* 85 N.J. 235, 426 A. 2d 467, 481 n. 8. (1981). *See also* Ferster, *supra* at 601-602, 613-616, 633 (As late as 1966 twenty-six states had eugenic sterilization laws; twenty-three of these were compulsory and all applied to the mentally retarded. The author notes that there has been some trend recently toward repeal of compulsory sterilization laws as well as a decrease in the number of sterilizations performed; that the decrease may be due to growing doubts about the constitutionality and efficacy of eugenic sterilization. North Carolina, whose sterilization statutes prior to 1975 provided procedures for sterilization upon consent of the per-

---

In re Truesdell

---

However, the recognition that procreation is a fundamental right renders suspect all but the most compelling justifications for the exercise of the awesome power of sterilization. Nevertheless, there are compelling societal and individual interests that can be furthered by sterilization in some cases. *In re Moore, supra.* To ensure that the State's interest may be furthered without unnecessary and unwarranted infringement upon the mentally retarded person's rights of personal privacy, bodily integrity and autonomy in matters of conception, procreation and child rearing, we hold that the petitioner must meet the following standards by clear, strong and convincing evidence:

> (1) That the respondent is a mentally ill or retarded person subject to the sterilization statutes (Art. 7, *supra*);
>
>> a. has a physical, mental or nervous disease or deficiency,
>>
>> b. the disease or mental deficiency is not likely to materially improve, and
>>
>> c. the respondent is likely to procreate a genetically defective child, or
>>
>> d. would probably be unable to care for a child or children; AND
>
> (2) The respondent is physically capable of procreation. Where, however, the respondent has reached sexual maturity, the court may presume fertility, absent medical evidence to the contrary; AND
>
> (3) There is a substantial likelihood that the respondent will voluntarily or otherwise engage in sexual activity likely to cause impregnation; AND
>
> (4) The respondent is unable or unwilling to control procreation by alternative birth control or contraceptive methods, including, but not limited to, supervision, education and training; AND

---

son or a relative and primarily on the non-eugenic grounds of unfitness for parenthood, reported over 50% of the nation's sterilizations in 1963; only five states performed more than twenty-five sterilizations during 1963, with 240 performed in North Carolina.)

(5) That the proposed method of sterilization entails the least invasion of the body of the respondent. In other words, the proposed surgical intervention is the least intrusive and least burdensome method for sterilization of the respondent.

In addition to the foregoing, in the case of a proposed female candidate for sterilization, such as respondent Truesdell, the court must consider and make findings relative to the possibility that the respondent will experience trauma or psychological damage if she becomes pregnant or gives birth, and, conversely, the possibility of trauma or psychological damage from the sterilization operation. The latter consideration, of course, would also be applicable to a male candidate for sterilization.

The foregoing standards are based soundly upon the requirements of Article 7, *supra*, and the decisional law of involuntary sterilization. *Skinner v. Oklahoma, supra; In re Moore, supra; In re Johnson, supra; N.C. Association of Retarded Children v. State of North Carolina, supra.* In addition, the standards are substantially identical to those developed by courts in other jurisdictions when called upon to give judicial authorization to a sterilization requested by a mentally retarded person's parents on behalf of their child. In general, these courts have concluded that although the United States Supreme Court has not acknowledged a constitutional right to *obtain* a sterilization, "the right to bear or beget children implies a more general right to reproductive autonomy which must include under certain circumstances the opportunity to prevent procreation through a variety of means including *non-compulsory sterilization*." (Emphasis added.) *Matter of A.W.*, 637 P. 2d at 369. Most courts have developed a constitutional "best interests" standard whereby the incompetent person's right to make this profoundly personal decision could constitutionally be exercised on his or her behalf in the absence of a statutory procedure. The New Jersey Supreme Court recognized that in such a case, the sterilization could not be characterized as either "compulsory" or "voluntary," but fell into a third category the court labelled, "lacking personal consent because of a legal disability." *In re Grady*, 426 A. 2d at 473. In each such case, the courts have held that the findings must include a determination in one form or another, that the respondent is likely to engage in sexual activity likely to cause impregnation,

and that all less drastic contraceptive methods have been proved unworkable or inapplicable before sterilization may be ordered. *In re Grady*, 426 A. 2d at 483 ("The likelihood that the individual will voluntarily engage in sexual activity or be exposed to situations where sexual intercourse is imposed upon her . . . [T]he feasibility and medical advisability of less drastic means of contraception, both at the present time and under foreseeable future circumstances."); *Matter of Guardianship of Hayes*, 93 Wash. 228, 608 P. 2d 635, 641 (1980) (en banc) ("[L]ikely to engage in sexual activity at the present or in the near future under circumstances likely to result in pregnancy . . . [A]ll less drastic contraceptive methods, including supervision, education and training, have been proved unworkable or inapplicable."); *Wentzel v. Montgomery General Hosp. Inc.*, 293 Md. 685, 447 A. 2d 1244, 1254 (1982), *cert. denied*, --- U.S. ---, 103 S.Ct. 790, 74 L.Ed. 2d 995 (1983) ("[T]he extent of the child's exposure to sexual contact that could result in pregnancy, the feasibility of utilizing effective contraceptive procedures in lieu of sterilization."). *Accord Matter of A.W.*, 637 P. 2d at 375-376; *Matter of Guardianship of Eberhardy*, 307 N.W. 2d at 914 (Callow, J., dissenting); *Matter of Moe*, 432 N.E. 2d at 720-722 (Best interests standard as such rejected because based on external criteria; doctrine of "substituted judgment better adapted to promote best interests of the individual by requiring court to determine values and desires of the affected individual."). *See also Wyatt v. Aderholt*, 368 F. Supp. 1383, 1384 (N.D. Ala. 1974) (Even though consent obtained, a determination that a proposed sterilization is in institutionalized individual's best interest must include a determination that "no temporary measure for birth control or contraception will adequately meet the needs of such resident, and shall not be made on the basis of institutional convenience or purely administrative considerations.") and Sherlock, *supra* at 966, 969, 971 ("There must be a reformulation of the best interests test to incorporate a presumption that sterilization is a *last resort* to be used only in a particularly difficult situation . . . [T]he retarded person must be sufficiently sexually active to create a likelihood of pregnancy or paternity . . . [T]he cornerstone of a last resort showing is a demonstration that alternative means of contraception will not work."). These authorities, by requiring a finding that the respondent is likely to engage in sexual activity without using contraceptive devices, make it clear that sterilization is to be used only as a last resort for a clear

and present problem, not for a hypothetical problem that may only surface in the distant future.

*A fortiori* these minimum basic conditions must be convincingly demonstrated when the State seeks an order of *compulsory sterilization,* for if there are other reasonable ways to achieve the legislative goals with a lesser burden on the constitutionally protected activity, the way of greater interference may not be chosen. *Dunn v. Blumstein,* 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed. 2d 274, 285 (1972). Sterilization may not be ordered if there is a less drastic means available. *Shelton v. Tucker, supra.* Application of the standards set forth above to the case under discussion reveals no error in the trial court's denial of the petition for sterilization of Sophie Truesdell.

### III

**[2]** It is undisputed that Sophie Truesdell is a mentally retarded individual subject to the sterilization statutes and that she is severely retarded and is not likely to improve.

### Inability to Care for a Child

Findings of Fact Nos. 6, 7, 8, 9 and 29, taken together, detail the degree of Sophie's mental deficiencies and her inability to care for her own basic needs. Accordingly, the trial court found as a fact and concluded as a matter of law that Sophie's mental retardation renders her unable to provide a minimal level of care for a child. "The statutory phrase 'care for the child' is not defined, but the courts in construing the phrase must find whether the evidence establishes a minimum standard of care consistent with both state interest and fundamental parental rights. The petitioner has the burden of proving at least probable inability to provide a reasonable domestic environment for the child." *In re Johnson, supra* at 653, 263 S.E. 2d at 809. The petitioner has met this burden with regard to Sophie's probable inability to care for a child. DSS presented clear and convincing evidence that Sophie's severe deficiencies in adaptive behavior render her unable to adequately care for her own most basic needs for food, clothing, and personal hygiene, and that these deficiencies would probably render her incapable of meeting even the most basic

physical needs of a child.[4] The court specifically found that Sophie herself will always need to live in a very closely supervised setting just to exist. We conclude that the findings of fact support the conclusion of law that Sophie would probably be unable to adequately care for a child.

## Capable of Procreation

Finding of Fact No. 10 states there is no indication that respondent is infertile; her regular monthly menstruation makes it reasonable to assume that respondent ovulates and is fertile. Sophie was 18 years of age at the time of trial. There was no medical evidence presented to otherwise raise doubts as to her fertility, and the court was entitled to presume that Sophie is capable of procreation.

## Sexual Activity

The court specifically found as a fact and concluded as a matter of law that "there is no evidence that respondent, at present, is likely to engage in sexual activity." Although petitioner took exception to the application of this standard, in its brief DSS submits that Findings of Fact Nos. 16-20 are sufficient to satisfy the sexual activity requirement. We disagree.

As a preliminary matter, we note that in each case the trial court must carefully review the living conditions of the respondent to determine the substantial likelihood that he or she will voluntarily, or otherwise, engage in sexual activity likely to cause impregnation. This will necessarily include an inquiry into the respondent's home environment, daily schedule, social activities, and the degree of supervision entailed in each aspect of this schedule.

---

4. We note that this determination may be more difficult to make in the case of a moderately retarded person whose social skills and adaptive behavior are less severely impaired than respondent's. This Court recently recognized that the due process rights of parents to conceive and raise their children required the court to consider the intangible, non-economic aspects of the parent-child-relationship in making the decision whether to terminate parental rights on the basis of neglect. *In re Montgomery*, 62 N.C. App. 343, 303 S.E. 2d 324 (1983). Significantly, the parents in *Montgomery* were only moderately retarded, the children earned satisfactory grades in school, and the order terminating their parental rights was vacated because the petitioner failed to show that the children's emotional and physical needs were so insufficienlty addressed that termination was justifiable.

The testimony taken as a whole tends to show that Sophie is severely retarded with some psycho-motor impairment. She is a very shy, withdrawn young woman who lives a highly structured and closely supervised existence. Sophie rides the bus to and from school, and never leaves home or school except in the company of school authorities or her foster mother. She has never wandered away from her classroom. Sophie has never voluntarily and publicly engaged in any acts of a sexual nature. Although evidence was presented that some acts of genital self-stimulation had occurred in the past, and may continue in private at present, this clearly is not sexual activity likely to cause impregnation. Therefore, Finding of Fact No. 21, that there is no evidence of sexual activity at the present time is fully supported by the evidence. Findings of Fact Nos. 16-20 concern Sophie's ability to derive pleasurable sensations from her genital area and her social environment. It is the State's contention that these findings demonstrate a sufficient likelihood of sexual activity to warrant sterilization.

Finding of Fact No. 20 contains mere speculation as to Sophie's "likely" passive reaction to a sexual advance by a male and is unsupported by the evidence. The testimony clearly indicated that Sophie reacts strongly against, rather than acquiesces in, most physical contact. Dr. Warner and the group of physicians who have been examining the respondent since she was four and a half years old are unable to perform a routine physical examination without having four adults hold her down. Findings of Fact Nos. 18 and 19 state that one of Sophie's classmates at the Center for Human Development has been observed to place his arm around her shoulder and that other students at the Metro Center have engaged in heterosexual activity. The latter finding is, of course, not relevant to the question of Sophie's own voluntary sexual activity, however, it is relevant to the question of whether a substantial likelihood exists that Sophie will engage in sexual activity with her classmates that was not an initial action on her part.

The record discloses that the young man who considered Sophie his "girlfriend" and was observed to place his arm around her shoulder, was described as being "totally unaware of his sexuality" and the significance of that contact. The Center's supervisor testified that the young man was protective of Sophie and

often helped her get around because of her unsteady, wobbly gait. The need to carefully review the actual sexual activity of the individual retardate was stressed by the authors of *Sterilizing the Retarded*, 60 N.C. L. Rev., *supra* at 968-970. They quote several studies on the matter which indicate that many mentally retarded persons have reduced capacity to reproduce or are in fact sterile. Moreover, among severely retarded individuals, sexual drive appears to be lower than normal. The authors conclude that there is significantly decreased sexual activity among those at the lower end of the retardation spectrum, due in part to decreased sexual drive, physical abnormalities that hinder heterosexual interaction and living situations which offer severely limited opportunities for sexual intercourse. *Id.* at 969. All of these factors are, to some degree, present in respondent's case. On re-direct examination, Dr. Holscher testified that "presently she is in a situation which has good supervision, and the risk of pregnancy is not extremely high at this time." Therefore, to the limited extent that Findings of Fact Nos. 16-20 are supported by the evidence, they do not, as petitioner contends, support a conclusion of law that Sophie was (1) sexually active herself, (2) substantially likely to engage in voluntary sexual activity likely to result in impregnation or, (3) that a substantial likelihood exists that Sophie will engage in sexual activity which she did not initiate. We conclude that the relevant and material finding of the court, that there is *no evidence of sexual activity at present*, is supported by clear, strong and convincing evidence, and it, in turn, supports the court's conclusion of law on the matter.

## Unable or Unwilling to Use Alternative Birth Control Methods

The petitioner must establish by clear, strong and convincing evidence that respondent is unable or unwilling to control procreation by alternative, less drastic contraceptive methods, including, but not limited to, supervision, education and training. Presumably, the trial judge's conclusion of law that sterilization would be in respondent's best interest is based in part on Findings of Fact Nos. 22, 23, and 24. These findings, taken together, and No. 22 in particular, state that respondent is not capable of effectively using any known method of birth control short of some form of sterilization.

The respondent contends that these findings are not supported by clear, strong and convincing evidence. Further, that the standard "unwilling or unable" necessitates that petitioner must take affirmative steps to prevent impregnation *and* must show that *after* these attempts have been made, the respondent is unwilling or unable to control her reproductive capacity. Such a showing was made by the petitioner in *In re Johnson, supra* at 651, 263 S.E. 2d at 807, where Social Services made an attempt to prevent impregnation first by insertion of an IUD and then by means of birth control pills. The respondent had the IUD removed and refused to take the birth control pills. Thus, both the petitioner's attempts and the respondent's unwillingness were amply demonstrated. However, to some extent, the steps that the petitioner must take in ascertaining the unworkability or medical infeasibility of contraceptive alternatives must necessarily vary according to the nature of the device or method and the limitations of the individual respondent.

We conclude that the petitioner has adequately met its burden of proof on the unworkability of the IUD. In view of Sophie's extreme fear of pelvic examinations, her poor reporting skills and the nature of the IUD, the court may draw the inference that respondent is unable to effectively use the IUD. without a showing that insertion of the device was in fact attempted. However, the record is devoid of evidence that petitioner has taken any affirmative steps at all to control respondent's reproductive capacity by any alternative form of birth control that is medically feasible for her.

Finding of Fact No. 23 states that respondent is incapable of administering birth control pills *on her own*. That fact alone does not establish that she is *unable to be given* birth control pills under the supervision of her guardian or caretaker. The evidence is overwhelming that Sophie will always need close supervision to meet her other most basic needs, therefore, her inability to take birth control pills on her own is not dispositive. Respondent's present caretaker testified that although Sophie prefers liquid medicines to tablets, she was able to take aspirin pills. There is no evidence that anyone ever attempted to administer birth control pills to the respondent. Therefore, the evidence presented is insufficient to support Finding of Fact No. 22 that respondent is

not capable of effectively using any known method of birth control short of some form of sterilization.

Findings of Fact Nos. 32 and 33 concern sterilization by means of hysterectomy as a birth control alternative, and state that such an operation, in the opinion of Drs. Holscher and Warner and the court, would be in the best interests of respondent. These findings are not supported by clear and convincing evidence. To a large degree, the findings are based upon respondent's menstrual hygiene difficulties, which are not material to the issue of birth control or contraception. As to the immediate need for contraception by means of sterilization, Dr. Holscher testified that he didn't think that there is "an extreme amount of danger in leaving things as they are now." When asked if it was his medical opinion that sterilization by means of hysterectomy was in Sophie Truesdell's best interest, the doctor replied, "Yes, I think, with a moderate amount of conviction. I don't feel like this is an urgent requirement, but I do think that, all things considered, it would be to her advantage." The court's findings do not adequately reflect the lack of immediate need for such a drastic surgical invasion of respondent's body. It is only the rare and unusual, the particularly difficult case, where sterilization will be the only adequate method of contraception available. The record demonstrates that this is not such a case. In short, it has not been established by clear, strong, and convincing evidence that respondent is unwilling or unable to use less drastic, alternative methods of birth control.

### Least Intrusive and Least Burdensome Method of Sterilization

A fundamental right may be invaded only by the least drastic or burdensome means available to accomplish the State's compelling objective. *Shelton v. Tucker, supra.* Article 7 does not define sterilization or indicate which medical procedure is to be used when a sterilization is ordered. G.S. 35-40 suggests the existence of various alternative means of sterilization by its requirement that the petition contain a statement of any contra-indications of "the requested surgical procedure." The statutes are otherwise silent as to the procedures to be used. The petition and the amended petition from DSS do not indicate which surgical procedure was requested, however, the medical testimony at trial focused on sterilization by means of hysterectomy. The trial

court allowed extensive evidence and found facts regarding problems posed by menstruation to Sophie herself and to her caretaker due to Sophie's inability to adequately attend to her own personal hygiene. Findings of Fact Nos. 11-15, 30, 32 and 33 are to the effect that sterilization by means of hysterectomy would be in respondent's best interest because it would stop her menstrual cycle *and* insure that she would not get pregnant in the future.

It must be remembered that the purpose of the standards is to prevent unnecessary and unwarranted abridgment of the respondent's fundamental procreative rights while at the same time allowing the State to further its interests. However beneficial it might possibly be to respondent to have her monthly menstrual cycle cease, for the purposes of determining whether the petitioner's request for sterilization may be granted, the two concerns—menstrual hygiene and fertility—must be kept separate and apart. In *Wentzel v. Montgomery General Hosp., Inc., supra,* the aunt and grandmother who cared for a severely retarded 13 year old female sought an order of court approving sterilization by means of a subtotal hysterectomy. Difficulties connected with the girl's menstruation, rather than the problems arising from pregnancy had apparently been the primary motivation of the aunt in her request for the operation. The Court of Appeals of Maryland affirmed the trial court's denial of the petition.

> [W]e think the trial judge was correct in determining that the evidence failed to disclose that sterilization by hysterectomy was in Sonya's best interest as being necessary for her medical or mental health. Manifestly, the fact that Sonya experiences pain and irritation during her menstrual cycle, which she does not understand and with which she has difficulty in coping, does not in itself provide any basis for authorizing a hysterectomy . . . [I]ndeed, in considering the best interests of an incompetent minor, the welfare of society or the convenience or peace of mind of the ward's parents or guardian plays no part.

447 A. 2d at 1254.

There is no statutory or constitutional authority for considering menstrual problems with respect to involuntary sterilization. The State's compelling interest is in the prevention of conception,

not in the problem respondent's menstruation may pose for her, and certainly not in the problem it poses for her caretaker. Rather, the inquiry must focus on which method or surgical procedure for sterilization poses the least health risk and the least intrusion into respondent's bodily integrity. No findings were made relevant to the other possible sterilization procedures known to medical science, although evidence was received from Dr. Warner on the comparative risks of tubal ligation and hysterectomy. Accordingly, the petitioner failed to demonstrate that the proposed surgical hysterectomy is the least burdensome and least intrusive means of sterilization.

## Best Interests

The petitioner contends that notwithstanding the lack of sexual activity, the evidence taken as a whole shows that sterilization is in the best interests of the respondent. Many of the findings of fact and conclusions of law are indeed couched in terms of respondent's best interests. Although G.S. 35-39 states that Social Services shall petition for sterilization if it would be in the "best interests" of the mentally retarded individual, this language is not contained in G.S. 35-43, the provision which specifically outlines the findings to be made by the trial judge. It is, therefore, doubtful whether compulsory sterilization can be ordered on the basis of undefined "best interests" alone in view of the fundamental interest at stake. Moreover, for purposes of instituting sterilization proceedings under G.S. 35-39, a determination that a proposed sterilization is in the respondent's best interests must include a determination that the respondent is sexually active *and* that no temporary measure for birth control or contraception will adequately meet the respondent's needs, in addition to the statutory grounds regarding defective offspring and parental unfitness. While petitioner adequately demonstrated, through medical testimony, the reasonable probability that a full term pregnancy and delivery would pose significant health risks and trauma for respondent, this evidence establishes only the fact that birth control or contraception are in her best interests. It does not establish that sterilization is in respondent's best interests. We are not inadvertent to petitioner's arguments that some permanent form of contraception might enable respondent to live under a slightly lessened degree of supervision. However, this justification is inadequate to establish the immediate need for

such an intrusive operation. The problem of Sophie's pregnancy is at most a possibility, while State action to compel a sterilization constitutes an irreversible certainty. It would permanently and irrevocably deprive Sophie of her procreative capacity. In *Olmstead v. United States*, 277 U.S. 438, 479, 48 S.Ct. 564, 572-573, 72 L.Ed. 944, 957 (1927) (Brandeis, J., dissenting), Justice Brandeis, one of the original developers of the theory of a "right of privacy" made the following pertinent observation about governmental invasions of individual liberties under the banner of best interests:

> Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in the insidious encroachment by men of zeal, well-meaning, but without understanding.

We are confident that the standards set forth in Part II, B adequately insure that the constitutional best interests of the respondent, as well as the State, will be served, while "unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child," *Eisenstadt v. Baird, supra*, will be avoided. Accordingly, petitioner has failed to show that sterilization is in Sophie's best interests and the court's conclusion of law to that effect is erroneous.

Consideration of the decisions petitioner relies upon to argue that a "sexual activity" requirement violates the non-sexually active retardate's fundamental right not to procreate does not mandate a different result. *See e.g. In re Grady, supra; Matter of Moe, supra; Matter of A. W., supra; Matter of Guardianship of Hayes, supra*. While it is true that respondent's inability to make an intelligent choice between the complementary rights to procreate or not to procreate should not spell forfeiture of these rights, it should be obvious that at present, respondent is exercising her right not to procreate. Furthermore, the key recognition in the area of reproductive liberty is that for the person involved, these are matters of individual, private choice. As the majority in *Eberhardy*, 307 N.W. 2d at 893, observed:

> Any governmentally sanctioned (or ordered) procedure to sterilize a person who is incapable of giving consent must be denominated for what it is, that is, the state's intrusion into

the determination of whether or not a person who makes no choice shall be allowed to procreate.

The majority declined to exercise its jurisdiction to authorize a sterilization on the basis of a best interests standard. The court reasoned that although the Constitution mandates the personal right of free choice of whether to procreate or not, which requires equal protection, in the absence of legislation in that troublesome area a greater burden would be inflicted by a judicial decision to act than a decision to withhold action.

> We are dealing with a special class of persons — the severely mentally retarded who cannot, on an informed and voluntary basis, give their consent to an irreversible procedure. And the irrevocability of sterilization in itself places it in a different classification from usual situations where the United States Supreme Court has considered the choice to procreate or not. *The choices thus far considered by the Supreme Court are not irreversible, for they involve only a decision affecting a present choice. They do not preclude a different choice at a later time. Sterilization does.* (Emphasis added.)

*Id.* at 896. These same concerns are implicated when a court must determine whether to order sterilization pursuant to G.S. 35-43. The petitioner's argument that denial of the request for sterilization through application of the foregoing standards was violative of respondent's constitutional rights is without merit.

## Conclusion

In sum, we affirm the denial of the petition on the grounds that petitioner has failed to carry its burden of proving by clear, strong and convincing evidence that (1) there is a substantial likelihood (a) that respondent will voluntarily engage in sexual activity likely to cause impregnation or (b) will engage in sexual activity which she did not initiate; (2) that respondent is unable or unwilling to control procreation by alternative birth control or contraceptive methods; and (3) that the proposed method of sterilization entails the least intrusive and least burdensome surgical intervention for respondent.

The trial court correctly denied the petition to sterilize respondent pursuant to G.S. 35-43 because the petitioner has

failed to meet its burden of establishing that sterilization of Sophie Truesdell *at this time* will further the State's interest in preventing the conception and birth of a child whose parent is unable to adequately care for it. However, because of the many erroneous findings of fact and conclusions of law contained in the order of 18 December 1981 pertaining *inter alia* to respondent's best interests and inability to use other forms of birth control, we remand the case to the trial court for entry of findings of fact and conclusions of law not inconsistent with this opinion.

Affirmed in part; reversed in part and remanded.

Judges WELLS and HILL concur.